James R. SMITH and David L. Vish, Appellants/Cross–Appellees,

v.

Carolyn King SMITH, Appellee/Cross–Appellant.

Nos. 2004–CA–001028–MR, 2004–CA–001056–MR.

Court of Appeals of Kentucky.

Jan. 20, 2006.

As Modified Feb. 10, 2006.

Case Ordered Published by Court of Appeals Feb. 10, 2006.

Rehearing Denied Nov. 30, 2006.

Discretionary Review Denied by Supreme Court Oct. 24, 2007.

**2**

**4**

David L. Vish, Louisville, KY, for appellants/cross-appellees.

Eugene L. Mosley, M. Thomas Underwood, Louisville, KY, for appellee/cross-appellant.

Before BARBER, MINTON, and TAYLOR, Judges.

*OPINION*

MINTON, Judge.

## I. INTRODUCTION.

Jim and Carolyn Smith appeal the property division made by the family court in conjunction with the dissolution of their marriage. Jim's lawyer, David Vish, joins this appeal because an award of attorney's fees to Jim is also an issue on appeal. We affirm, in part, and we reverse, in part.

## II. THE PROCEEDINGS BELOW.

Jim and Carolyn were married for 27 years when Jim filed the petition to dissolve the marriage in November 2000. The division of the parties' substantial marital estate generated protracted and acrimonious litigation that culminated in a five-day family court trial. In February 2004, the family court completed the Augean task of dividing Jim and Carolyn's property and debts by issuing a detailed, fifty-five page decree. Both parties filed post-decree motions resulting in an amended decree in April 2004. Both Jim and Carolyn have appealed to this Court.

## III. ANALYSIS.

### A. Motion to Strike.

Before we may address the issues raised in these appeals, we must resolve a preliminary procedural issue. Carolyn has

moved to strike Jim's combined reply brief because it does not contain citations to the record to support Jim's arguments. Carolyn correctly asserts that Jim's brief violates Kentucky Rules of Civil Procedure (CR) 76.12 because it contains insufficient citation to the enormous trial court record. Carolyn is correct that it is not our responsibility to search the record to find where it may provide support for Jim's contentions.[1] But rather than striking Jim's brief, we choose to give little credence to the arguments by either party that are not supported by a conforming citation to the record. So we deny Carolyn's motion to strike.

### B. Property and Debt Division.

#### 1. Standard of Review.

Before analyzing the merits of each party's arguments, we must review the basic tenets of property division in a dissolution context and the permissible scope of our review. In a dissolution proceeding involving contested property distribution issues, a trial court's first step must be to categorize each piece of contested property as either marital or nonmarital.[2] Next, the court must assign each party's nonmarital property to that party.[3] Finally, the court must equitably divide the parties' marital property in just proportions.[4]

But the distribution of property for distribution is not as simple and clearcut as the basic three-step process would indicate because some property may have both marital and nonmarital components by virtue of the fact that it was purchased with a combination of marital and nonmarital funds.[5] This situation occurred repeatedly in this case. In such situations, "a trial court must determine the parties' separate nonmarital and marital shares or interests in the property on the basis of the evidence before the court. Kentucky courts have typically applied the 'source of funds' rule to characterize property or to determine parties' nonmarital and marital interests in such property."[6] The "source of funds" rule "simply means that the character of the property, i.e., whether it is marital, nonmarital, or both, is determined by the source of the funds used to acquire property."[7] If such a piece of mixed-status property increases in value during the course of the marriage:

> trial courts must determine from the evidence "*why* the increase in value occurred" because "where the value of [nonmarital] property increases after marriage due to general economic conditions, such increase is not marital property, but the opposite is true when the increase in value is a result of the joint efforts of the parties." KRS [Kentucky Revised Statutes] 304.190(3), however, creates a presumption that any such increase in value is marital property, and,

---

1. *See, e.g., Monroe v. Cloar,* 439 S.W.2d 73 (Ky.1969).

2. *Holman v. Holman,* 84 S.W.3d 903, 907 (Ky.2002).

3. *Travis v. Travis,* 59 S.W.3d 904, 909 (Ky. 2001).

4. *Id.*

5. However, "property acquired prior to marriage retains its [nonmarital] character even if marital funds are used to enhance the value of

that property. When the value of [nonmarital] property is enhanced through the use of marital funds, only the increase in value of the property and the funds contributed in pursuit of that increase are subject to division as marital property." *Overstreet v. Overstreet,* 144 S.W.3d 834, 837, n. 7 (Ky.App.2003).

6. *Travis,* 59 S.W.3d at 909 (footnote omitted).

7. *Id.* at 909, n. 10.

therefore, a party asserting that he or she should receive appreciation upon a nonmarital contribution as his or her nonmarital property carries the burden of proving the portion of the increase in value attributable to the nonmarital contribution. By virtue of the KRS 403.190(3) presumption, the failure to do so will result in the increase being characterized as marital property.[8]

It is important to bear in mind that a trial court is not obligated to divide the marital property equally.[9] Rather, a trial court need only divide the marital property "in just proportions." [10]

Finally, a trial court has wide discretion in dividing marital property; and we may not disturb the trial court's rulings on property-division issues unless the trial court has abused its discretion.[11] The question of whether an item is marital or nonmarital is reviewed under a two-tiered scrutiny in which the factual findings made by the court are reviewed under the clearly erroneous standard and the ultimate legal conclusion denominating the item as marital or nonmarital is reviewed

de novo.[12] Statements defining the standard of review of a trial court's decision to classify an item as marital or nonmarital is one in which the appellate courts of this state have been consistently inconsistent. On at least two occasions, the Supreme Court has, without discussion, used the clearly erroneous standard in reviewing a trial court's categorization of property. Similarly, we have also used the clearly erroneous standard, in both published and unpublished opinions.[13] But we have also recently used a de novo standard of review, although we did not explain why we deviated from the clearly erroneous standard.[14] Likewise, the Kentucky Supreme Court recently used, also without explanation or discussion, the de novo standard.[15] The lack of interplay between these cases makes difficult the task of articulating the standard of review. We believe that the way properly to harmonize these cases is to recognize a two-tiered standard of review. Given the fact that the trial court is unquestionably in the best position to judge the weight and credibility of the evidence, we believe that the factual findings underpinning the determination of

8. *Id.* at 910 (quoting *Goderwis v. Goderwis*, 780 S.W.2d 39, 40 (Ky.1989)) (footnotes omitted).

9. *Davis v. Davis*, 777 S.W.2d 230, 233 (Ky. 1989).

10. *Id.* (quoting KRS 403.190(1)).

11. *Id.*

12. *See Marcum v. Marcum*, 779 S.W.2d 209, 211 (Ky.1989) ("In view of the evidence regarding the deed, the trial court was clearly erroneous in holding that any portion of this property was the husband's nonmarital property."); *Goderwis*, 780 S.W.2d at 41 ("The trial court found that the property at 39 Erlanger Street was subject to division as marital property...." The basic finding of the trial court was not clearly erroneous and should not be set aside. CR 52.01.).

13. *See, e.g., Brunson v. Brunson*, 569 S.W.2d 173, 177 (Ky.App.1978) ("It was clearly erroneous for the trial court to assign any amount to Mr. Brunson as nonmarital property, traceable to the personalty inherited from his father.").

14. *Overstreet*, 144 S.W.3d at 837 (" 'Whether certain property is part of the marital estate subject to division presents a question of law that we decide without deference to the trial court's decision.' ") (quoting *Chen v. Chen*, 142 Wis.2d 7, 416 N.W.2d 661, 663 (1987)).

15. *Holman v. Holman*, Ky., 84 S.W.3d 903, 905 (Ky.2002) ("Whether a disability retirement is classified as marital or nonmarital property involves an application of the statutory framework for equitable distribution of property upon divorce and therefore constitutes a question of law subject to this Court's independent determination.").

whether an item is marital or nonmarital are entitled to deference and, consequently, should be reviewed under the clearly erroneous standard.[16] Ultimately, classification is a question of law, which should be reviewed de novo.[17] Bearing those overarching principles in mind, we now turn to the arguments raised by Jim and Carolyn.

### 2. The UBS/Paine Webber Account.

█ Both sides take issue with the family court's division of the money in the UBS/Paine Webber Account. Jim contends that the lower court erred by finding that only 14.2 percent of the account was marital property, the remainder being Carolyn's nonmarital property. Carolyn argues that the lower court erred by not finding that whole account was her nonmarital property.

The history of this account is complicated. According to the family court's findings, Carolyn's father, Walter King, was a successful entrepreneur who amassed considerable wealth that he shared with his two daughters, Carolyn and her sister, both before and after his death. Toward that end, in December 1983, Walter arranged for the Board of Directors of one of his companies, Easco, Inc., to authorize the sale of 1,600 shares of Easco stock to Carolyn and her sister at a cost of $1.25 per share. Then, in December 1983, Walter wrote Carolyn a check for $2,000.00 and gave it to her to buy the Easco stock.

Jim, as secretary for Easco's parent company, which Walter also owned, came into possession of that $2,000.00 check, which he deposited in one of his personal bank accounts. Jim then wrote a check from one of his personal accounts to Easco with the notation "Eagle Standard [Easco] stock."

Three years later, Easco was sold and Carolyn received $132,335.57 for her stock. Walter also gave Carolyn $40,000.00 from his own Easco profits, as well as a $10,000.00 loan (which was later forgiven). And, in 1989, Carolyn received an additional $35,920.00 as her portion of the resolution of a lawsuit that benefited Easco.

Carolyn deposited her $132,335.57 check into a mutual fund account at Dupree & Co. That account listed both Carolyn and Jim as the owners of the account. The $40,000.00 gift and $10,000.00 loan were not deposited into that Dupree account and, according to the decree, "there are gaps in bank and other financial statements and accounts making a precise tracing of Walter's gifts impossible." In June 1987, Jim wired $118,700.00 from the Dupree account to his personal account at Central Bank, a transfer of which Carolyn claims to have been unaware.

In January 1988, Jim wrote a check from his Central Bank account for slightly over $150,000.00 to open a Merrill Lynch account. That Merrill Lynch account was initially in Carolyn and Jim's names, but Walter later prevailed upon Carolyn to remove Jim's name from the account. Over the ensuing years, deposits of over $1,000,000.00 were made in that Merrill Lynch account and its successor accounts at J.C. Bradford, Paine Webber and UBS. And, in the divorce proceedings, each party attempted to trace the various deposits. But those tracing attempts were not entirely successful and have resulted in divergent conclusions. The trial court ultimately found that $937,696.00 in deposits were Carolyn's nonmarital funds from gifts from Walter, and that $155,757.00 in deposits were marital funds. At the time of trial, the account balance was $596,024.00,

---

**16.** See CR 52.01.

**17.** New v. Commonwealth, 156 S.W.3d 769, 774 (Ky.App.2005).

which the trial court reduced to a prorated share of $84,635.00 in marital funds and $511,389.00 in Carolyn's nonmarital funds. The trial court divided the marital portion of the account equally (although Jim's share was ordered to be used to reimburse Carolyn for her nonmarital share in a piece of real estate, which will be discussed more fully later in this opinion). As stated previously, both Jim and Carolyn have appealed this division.

Jim first contends that the family court erred by finding that the Easco stock was purchased with a gift from Carolyn's father. Jim contends that he wrote a check to purchase the Easco stock from his own bank account.

As the events surrounding the Easco stock purchase occurred over twenty years ago, tracking that stock purchase is difficult, if not impossible. But the record clearly shows that Easco's Board of Directors voted to offer the 1,600 shares to Carolyn, not to Jim. So it would have been illogical for Jim to finance the stock purchase with funds from his own separate bank account. It is also uncontested that Walter wrote a check to Carolyn for the exact amount needed to buy the Easco stock very near the time when the stock was bought. This close proximity in time suggests that Walter's check was likely intended to fund Carolyn's Easco stock purchase. But a temporal coincidence is probably insufficient proof on its own. Thus, it is important to note that Carolyn testified at one of her depositions that her father bought the Easco stock for her with a check for $2,000.00. So there exists substantial evidence to support the trial court's conclusion that Walter's check was used, or was intended by him to be used,

to fund Carolyn's purchase of the Easco stock.

Based upon its finding that Carolyn's stock was purchased using Walter's gift to her, the trial court found that the Easco stock was Carolyn's nonmarital property. So the trial court then found that the $132,335.57 Carolyn received from selling that stock, and the $35,920.00 Carolyn later received from a lawsuit settled to Easco's advantage, were also her nonmarital property. Jim contends that the increase in the value of the Easco stock should have been classified as marital property because Carolyn took no role whatsoever in Easco's affairs while he served as Easco's secretary and general counsel. But Jim points to no specific evidence in the record to contradict the trial court's finding that "[t]here is no proof that Jim made any financial decisions or exerted any managerial discretion concerning the development and profitability of Easco. Furthermore, Jim was paid a salary for his services to Midcoast and Easco." Thus, the trial court's decision that the increase in value of the Easco stock should be deemed Carolyn's nonmarital property should be affirmed. Likewise, Jim points to nothing specific in the record to contradict the trial court's findings that the money Carolyn received in the settlement of the legal action involving Easco should be deemed Carolyn's nonmarital property.

Finally, Jim argues that the trial court erred by finding that the $150,000.00 deposit, which opened the Merrill Lynch account, was Carolyn's nonmarital proceeds from the Easco stock sale and other monetary gifts from Walter to Carolyn. Jim argues that Carolyn failed properly to trace a $50,000.00 gift from Walter that was allegedly used to help open the Merrill Lynch account.[18] But a close examination

---

18. The presumption exists that all property acquired during marriage is marital property.

Thus, if a piece of nonmarital property is no longer owned at the time of dissolution, the

of Jim's argument on this issue shows that Jim cites to no evidence in the record to support it. As previously stated, it is not our duty to search the record to find support for Jim's argument.[19] So we affirm the trial court's conclusion that the funds used to open the Merrill Lynch account were Carolyn's nonmarital property.

Carolyn's appeal on this issue revolves around her contention that "[t]he trial court erred in finding that any deposits to the Merrill Lynch account which were not definitively traced to the Kings [i.e., Walter] constituted marital property." Thus, Carolyn contends that the entirety of the UBS account (a successor to the Merrill Lynch account) should be her nonmarital property. Carolyn recognizes that she has not fully traced all deposits to that account, but she urges for the relaxed tracing standard enunciated in *Chenault v. Chenault*[20] for her because she had no business expertise and totally relied upon Jim to manage her finances.

But we perceive that Carolyn pushes *Chenault's* relaxation of tracing standards too far. Carolyn has pointed to no concrete proof showing that the deposits to the Merrill Lynch account in question orig-

inated as gifts to her by Walter. Speculation and conjecture will not suffice to meet even a relaxed burden to show that the deposits in question were nonmarital gifts from Walter.[21] Furthermore, unlike the situation in *Chenault*, the large amounts of cash flowing through Jim and Carolyn's various bank accounts means that there were other potential sources for the deposits in question.[22] Thus, Carolyn's argument must fail.

In summary, we affirm the entirety of the trial court's findings regarding the UBS account.

### 3. The Massachusetts Mutual Second–to–Die Policy.

In order to reduce inheritance taxes that Carolyn and her sister would likely have incurred upon the death of Walter and Katsy King, Walter followed his financial planner's advice to set up a second-to-die life insurance policy with Massachusetts Mutual Insurance. Under the terms of that policy, which had a face value of $800,000.00, each of Walter's daughters was the beneficiary when the later of Walter and Katsy died. Although Carolyn was the named beneficiary, Wal-

---

"nonmarital" claimant must "trace" the previously owned piece of nonmarital property into a presently owned asset. *Sexton v. Sexton*, 125 S.W.3d 258, 266 (Ky.2004).

**19.** *Monroe*, 439 S.W.2d at 73.

**20.** 799 S.W.2d 575, 578 (Ky.1990) ("While ... precise requirements for nonmarital asset-tracing may be appropriate for skilled business persons who maintain comprehensive records of their financial affairs, such may not be appropriate for persons of lesser business skills or persons who are imprecise in their record-keeping abilities. This problem is compounded in a marital union where one spouse is the recorder of financial detail and the other is essentially indifferent to such matters. Moreover, such a requirement may promote marital disharmony by placing a pre-

mium on the careful maintenance of separate estates.").

**21.** *See, e.g., Terwilliger v. Terwilliger*, 64 S.W.3d 816, 820 (Ky.2002) ("The presumption in Kentucky is that all property acquired during the course of the marriage is marital property, unless the property can be shown to have originated in one of the excepted ways outlined in KRS 403.190(2). A party claiming that property acquired during the marriage is other than marital property[] bears the burden of proof.").

**22.** *See id.* at 821 ("Additionally, while the Chenaults had no other likely source for the funds claimed by Ruby Chenault as nonmarital, Tom Terwilliger had money flowing in and out of his various corporations from any number of sources.").

ter and Katsy paid the substantial annual premiums for the policy by way of gifts to both Carolyn and Jim. Thus, Walter and Katsy wrote checks to Carolyn and Jim that totaled the annual premium payments, $28,894.00. Then, Carolyn and Jim, in turn, sent premium checks to the insurance company. It was necessary for Walter and Katsy to send checks to Jim, even though he was not a named beneficiary of the policy, to remain within the $10,000.00 per person per year maximum gift to avoid gift taxes. By the time Katsy died, Carolyn had taken loans against the policy. Thus, Carolyn was paid only $641,777.14, not $800,000.00.

The record reflects that the total premiums paid on the policy were $171,868.00, which the trial court found to have been totally derived from gifts by Walter and Katsy to Jim and Carolyn. The trial court found that the total amount given to Jim by Walter and Katsy was $74,080.00, which the trial court found to be Jim's share of the life insurance proceeds, the balance being Carolyn's nonmarital property.[23] On appeal, Jim contends that the trial court should have afforded him a larger percentage of the life insurance policy proceeds because he has properly traced his nonmarital property (the monetary gifts to him from Walter and Katsy which he used to help pay the life insurance premiums) into a currently held asset, the UBS account. Conversely, Carolyn contends that the trial court erred by awarding Jim any portion of the life insurance proceeds.

The trial court based its decision to award Jim only the value of his gifts on what it perceived to be Walter's intent to have the policy benefit only Carolyn. In fact, the donor's intent is the primary factor in determining whether a transfer is a gift and, if so, whether the gift is made jointly or to only one spouse.[24] A donor's intent may be deduced from the donor's testimony or it may be inferred from the facts and circumstances surrounding the transaction.[25] Finally, it must be noted that "[t]he determination of whether a gift was jointly or individually made is a factual issue[ ] and[,] therefore, subject to the CR 52.01's clearly erroneous standard of review."[26]

Walter was unavailable to testify. But, as the trial court noted, his notes and actions demonstrated an overriding desire to preserve as much of his estate as possible for Carolyn and her sister. Jim has pointed to nothing specific in the record evidencing an intent by either Walter or Katsy to have the second-to-die policy benefit him other than the indirect benefit he would receive as Carolyn's spouse. Further supporting the idea that Walter intended the policy to benefit only Carolyn is the fact that Jim was not a named beneficiary of the policy.[27] Thus, the record supports the contention that Jim received the checks from Walter and Katsy merely because he was an available conduit for gift tax purposes[28] that could be relied

23. As will be discussed more fully later in this opinion, the trial court deducted $8,050.00 from Jim's share of the life insurance proceeds to reimburse Carolyn for her nonmarital investment in a marital home.

24. *Sexton,* 125 S.W.3d at 268–269.

25. *Id.*

26. *Id.*

27. *See id.* at 268 ("And, even though title is not determinative of whether a transfer to a party is a gift, nevertheless, it is evidence for the trial court to consider.") (footnote omitted).

28. The tax treatment of a gift and the proposed usage of the gift are proper factors for determining the intent of a donor. *Hunter v. Hunter,* 127 S.W.3d 656, 662 (Ky.App.2003).

upon to use the checks to pay the life insurance premiums.[29] Thus, as the more logical conclusion is that Walter and Katsy had no intent to give the checks to Jim as tokens of affection, the trial court's finding that the $74,080.00 in checks from Walter and Katsy to Jim were gifts and, as such, were Jim's nonmarital property is clearly erroneous.[30] Accordingly, we reverse the trial court's determination that the $74,080.00 in checks given to Jim by Walter and Katsy are Jim's nonmarital property. On remand, the trial court shall amend the decree to reflect that the entirety of the second-to-die policy proceeds is Carolyn's nonmarital property.

### 4. The Crummey Trust.

In 1990, Walter created the King Family Trust, an irrevocable trust of a type commonly referred to as a Crummey Trust. Under the provisions of that trust, Walter made gifts directly to the trust annually in the name of his daughters and their spouses. The trustee, Katsy, informed the beneficiaries each year that they each had a right to withdraw up to $20,000.00 from the trust within thirty days of a gift being made to it. According to testimony from estate planning experts considered by the trial court, if such a withdrawal is not timely made, the individual beneficiary loses his or her right to withdraw the funds. Under the provisions of the King Family Trust, Katsy was the primary beneficiary; and, upon her death, the corpus of the trust would pass, tax-free, to Carolyn and her sister.[31]

Upon dissolution, the trial court awarded Jim $41,132.00 as his nonmarital property, representing the face value of the monetary gifts given to Jim via the Crummey trust.[32] On appeal, Jim argues that he should receive the benefit of the increase in value of the amounts gifted to him. Carolyn, conversely, argues that Jim should receive nothing from the Crummey trust.

**29.** Martin Weinberg, a former attorney who had intimate knowledge of Walter's intent in this area by virtue of the fact that he helped Walter with estate planning, definitively testified that "[t]he money was given to Jim only because of his marriage to Carolyn."

**30.** *See Sexton,* 125 S.W.3d at 269 ("In other words, Appellee's father did not intend to make a gift to Appellant; she was only added as an owner of the partnership interest because of her marriage to Appellee, and[,] therefore, she received no additional interest by reason of the partnership interest being placed in their joint names."); *Angel v. Angel,* 562 S.W.2d 661, 665 (Ky.App.1978) ("Therefore, the tract conveyed in 1961 by gift from the wife's brother should be considered as the wife's nonmarital property unless the trial court finds that Ester Angel was named as a grantee for a reason other than his marriage to Mossie Lee.").

**31.** For more information regarding the mechanics of Crummey Trusts, see, *e.g., Karpf v. Karpf,* 240 Neb. 302, 481 N.W.2d 891, 893–94

(1992) ("The record explains that the withdrawal provision is a tax-planning device used to assist taxpayers in minimizing ultimate estate tax liability by enabling them to make tax-free gifts during their lifetimes to the amount limited by law. In order to qualify as a tax-free gift, the taxpayer must transfer a 'present,' as contrasted from a 'future,' interest. To be a present interest, a gift to the beneficiary of a trust must be subject to withdrawal by the beneficiary in the calendar year during which the gift was made. (As an aside, we note that in apparent honor of D. Clifford Crummey, who established that gifts to minors are transfers of present interests, *see Crummey v. C.I.R.,* 397 F.2d 82 (9th Cir. 1968), limited withdrawal provisions are often identified as Crummey provisions, and trusts containing such provisions are frequently referred to as Crummey trusts.")).

**32.** As will be discussed later in this opinion, Jim did not actually receive the $41,132.00, as the trial court ordered those funds to offset what Jim owed Carolyn from the proceeds of sales of real property.

As with the second-to-die policy, we believe the trial court erred by awarding Jim any interest in the Crummey trust. That trust was clearly established to benefit only Walter's daughters, not his sons-in-law. Evidence of Walter's intent could be readily ascertained by noting that Jim is not listed as a named beneficiary of the trust.[33] Thus, it appears manifest that Jim was named as a donee on some gifts to the Crummey trust simply because he was married to Carolyn. Furthermore, Jim cites to nothing in the record to contradict the testimony of the estate planning experts that he waived his right to claim anything from the trust when he declined to exercise his option to withdraw the funds given in his name within thirty days of their deposit. Furthermore, Jim cites to no cases that support a revival of his right to withdraw from the Crummey trust. Thus, the trial court's decision to grant Jim $41,132.00 from the Crummey trust is reversed and remanded.

### 5. The $57,000.00 Loan from Walter.

In November 1978, Jim and Carolyn purchased their first marital home, which was located on Forest Avenue in Lexington, Kentucky, for $57,000.00. It is uncontested that all of the $57,000.00 purchase price came as a loan from Walter to both Jim and Carolyn. Walter's handwritten notes indicate that he intended for Jim and Carolyn to remit $475.00 per month to him to repay the note. But it is uncontested that Jim and Carolyn made no payments to Walter.

Walter purportedly left an inventory in his lock box with a notation "Carolyn King Smith notes (all forgiven)." The trial court found that, based on Walter's inventory, the forgiveness of that loan was a nonmarital gift to Carolyn. The forgiveness of that loan was not definitively traced to any currently held asset, but the trial court required Jim to reimburse Carolyn for the note using his share of the marital portion of the UBS account.[34] On appeal, Jim contends that the note was a loan to both parties during their marriage meaning that the forgiveness of it must be a marital asset.

We begin our analysis of this issue by noting that the record supports the trial court's decision to treat the note from Walter as a joint debt, owed by both Jim and Carolyn.[35] However, we do not believe that the trial court's finding that a generic inventory of items bearing a cryptic, typed notation "Carolyn King Smith notes (all forgiven)[,]" is evidence, substantial or otherwise, that Walter forgave the $57,000.00 note as a gift to Carolyn alone. First, there is no indication that the $57,000.00 note was among those in the lock box. Second, neither party has pointed to anything in the record definitively showing that the typed inventory of Walter's lock box was actually prepared by

---

**33.** *Sexton,* 125 S.W.3d at 268.

**34.** According to the trial court's decree, Jim deposited at least some of the proceeds from the sale of the Forest Avenue property into his personal retirement or banking accounts.

**35.** We note that there is no presumption that a debt incurred during marriage is a marital debt. *Neidlinger v. Neidlinger,* 52 S.W.3d 513, 522–523 (Ky.2001). However, in the case at hand, Walter's handwritten note includes the following notation: "Debt—Jim & C.N.

[$]57,000." Also, a typed notation above a copy of the savings certificate Walter used to give the $57,000.00 to Carolyn and Jim provides a notation that the value of the savings certificate was $220,000.00 "less $57,000 (lend C & J)[.])" A similar handwritten notation appears on a letter from the St. Louis County Bank to Walter regarding his renewal of that savings certificate. Thus, the record amply supports the trial court's conclusion that the $57,000.00 was loaned to both Jim and Carolyn.

Walter (or done at his request). Finally, we doubt that a written note ever existed as the only evidence on that subject we have seen is Jim's testimony that there was never an actual written note evidencing the $57,000.00 "loan." [36] So we find that the trial court erred by concluding that the broad notation on an apparently unsigned inventory of a lock box demonstrates Walter's intent to forgive the debt solely as a gift to Carolyn.

The $57,000.00 loan was forgiven during Carolyn and Jim's marriage. Thus, that forgiveness is presumed to be marital property; and Carolyn, as the party claiming that the forgiveness is her nonmarital property, bears the burden of proof.[37] We recognize Walter's overriding intent was to provide for his own children. But neither that general intent, nor the previously mentioned lock box inventory, which are all Carolyn relies upon, are sufficiently specific to demonstrate that Walter's forgiveness of the $57,000.00 note was a nonmarital gift to Carolyn. Thus, the trial court's decision to treat the forgiveness of the loan as a nonmarital gift to Carolyn is clearly erroneous and, consequently, must be reversed.[38] As dividing marital property in just proportions is a matter reserved for the trial court, not this court, this issue must be remanded so that the forgiveness of the $57,000.00 loan may be divided in just proportions.

### 6. Grimes Mill Farm.

In 1974, Jim and Carolyn purchased a farm in Clark County, Kentucky for $59,025.00. It is uncontested that Walter helped with the down payment for the farm by giving Jim and Carolyn $3,996.00 each. Jim contends that his father, Donald, gave him alone $8,000.00 to contribute toward the down payment on the farm. Carolyn contends that Jim has no evidence to support his claim regarding Donald's alleged $8,000.00 gift. The trial court's findings on Donald's gift are not specific. But we interpret those findings to be that Donald did give $8,000.00 toward a down payment on the farm but that the $8,000.00 was a gift to both parties.[39] Originally, Jim and Carolyn held joint title to the farm; but the title was later placed solely in Carolyn's name to protect the farm from Jim's creditors.

Jim and Carolyn never lived on the farm. Rather, they used it for pleasure and, at various times, growing crops or raising cattle. The trial court found the fair market value of the farm is $525,000.00. The trial court found that the farm was marital in nature and awarded it to Carolyn, with instructions that the equity on the farm be apportioned 60 percent to Carolyn and 40 percent to Jim. The trial court's division of the farm satisfied neither Carolyn nor Jim. Jim contends that

---

**36.** According to Jim's April 24, 2002, deposition, p. 66 ("Q. Now, do you recall whether there were any loan documents that would indicate the [$57,000.00] debt, or whether it was just an oral representation? A. It was just oral."). As no written note apparently ever existed, Jim's argument that the written note must be produced for examination under the best evidence rule is disingenuous, at best.

**37.** *Terwilliger,* 64 S.W.3d at 820.

**38.** *Sexton,* 125 S.W.3d at 269 ("The determination of whether a gift was jointly or indi-

vidually made is a factual issue[ ] and[,] therefore, subject to the CR 52.01's clearly erroneous standard of review.").

**39.** The entirety of the trial court's findings on this issue is as follows: "Jim claims that his parents contributed the other half of the down payment, $8,000.00 by a gift to him alone. The Court finds that both sets of parents intended to make a gift to both parties and that each party received approximately half of the down payment from their parents and parents-in-law."

he should have been awarded half of the equity in the farm. Carolyn, by contrast, asserts in her cross-appeal that she should have been awarded at least 70 percent of the equity in the farm.

The first issue to be resolved is Carolyn's contention that Walter gave $3,996.00 each to the parties rather than the $3,396.00 found by the trial court. Walter's December 1974 quarterly gift tax return, heavily relied upon by Carolyn, is of little value as it is unsigned. However, Jim does not contest Carolyn's contention regarding the amount of this gift by Walter; and the $3,996.00 figure is supported by the trial testimony of Maria Fernandez, an attorney focusing in tax and estate planning. Furthermore, on page ten of the decree, the trial court listed the amount of Walter's gifts as $3,996.00 each to Carolyn and Jim. Thus, on remand, the trial court shall correct what appears to be a typographical error on page thirty-eight of the decree regarding the amount of Walter's gifts toward the down payment on the farm.

The next issue to be resolved regarding the farm is whether the trial court properly found that Donald contributed $8,000.00 toward the down payment for the farm. The trial court cites to no specific testimony to support its finding that Donald gave Jim $8,000.00 toward purchase of the farm. On appeal, Jim relies upon two exhibits to support his contention. The first, labeled Plaintiff's Exhibit 19, which purports to be Walter's handwritten notes, does not, con-

trary to Jim's assertions, contain any mention of an $8,000.00 gift by Donald. However, Plaintiff's Exhibit 6, a typed closing statement for the farm purchase, clearly shows that Donald and his wife gave $8,000.00 to help fund the farm purchase. Thus, the trial court's finding regarding Donald's donation of $8,000.00 for the purchase of the farm is supported by substantial evidence. Exhibit 6 does not, however, indicate that the $8,000.00 was a gift to Jim alone. Jim cites to nothing else to show that Donald gave the $8,000.00 to him alone. Thus, he has failed to meet his burden to show that the $8,000.00 gift from Donald should be his nonmarital property.[40]

We now turn to the main farm-related issue: whether the trial court erred by awarding 60 percent of the farm's equity to Carolyn and 40 percent to Jim. Jim contends that the farm should be divided equally, as each party's parents provided half of the down payment. Although it has some degree of superficial appeal, Jim's contention that the farm must be divided equally must fail. There simply is no requirement that marital assets be divided equally.[41] In light of the fact that Carolyn apparently spent more time at the farm and had a more active role in making the improvements to it (which will be discussed more fully shortly), we cannot say that the trial court's decision to award Jim less than half of the equity in the farm was so extreme as to be an abuse of discretion.[42]

---

40. *Terwilliger,* 64 S.W.3d at 820.

41. *See, e.g., Russell v. Russell,* 878 S.W.2d 24, 25 (Ky.App.1994) ("There is not a presumption or requirement that marital property be equally divided in a dissolution of marriage action.").

42. *Cochran v. Cochran,* 746 S.W.2d 568, 569–570 (Ky.App.1988) ("This court cannot disturb the findings of a trial court in a case involving dissolution of marriage unless those findings are clearly erroneous. We have reviewed the record and the trial court's findings that deal with the property division and we find no clear error. The property may very well have been divided or valued differently; however, how it actually was divided and valued was within the sound discretion of the trial court.") (internal citation omitted).

We now turn our attention to Carolyn's opposite contention that she should have been awarded more than 60 percent of the farm's equity. According to Carolyn, she has expended over $200,000.00 in nonmarital funds (from the UBS account and its predecessors) in planting trees and otherwise improving the farm, meaning that she should have been awarded a larger percentage of it. But Carolyn points to nothing concrete in the record contradicting the trial court's following findings:

> Although it is clear that Carolyn's funds have contributed to significant improvements and some reduction of the mortgage in recent years, Lange's [Carolyn's accounting expert, Vickie Lange] conclusion that Carolyn should be credited for 82 of the mortgage payments and almost all the improvements [to the farm] appears significantly flawed as she had no records, basically, prior to 1988; never consulted with Jim and relied solely on representations made to her by Carolyn. Accordingly, although Carolyn has contributed non-marital funds (or funds from a largely non-marital account to farm improvements), it is impossible to pinpoint with precision the relationship between her non-marital contributions and the increase in value of this farm.

The trial court did compensate Carolyn for her physical and financial efforts toward improving the farm by virtue of awarding her 60 percent of the equity. As that division does not appear clearly erroneous, we are not at liberty to disturb it.[43]

### 7. Loans from Jim's Father.

Jim argues that the trial court erred by finding that alleged loans from Donald are solely Jim's responsibility to repay. Jim's arguments must fail.

It is vital to understand that unlike marital property, there is no presumption that a debt incurred during a marriage is marital or nonmarital in nature.[44] Rather, debts are generally "assigned on the basis of such factors as receipt of benefits and extent of participation[.]"[45] Finally, there is no presumption that debts must be divided equally or in the same proportion as the marital property.[46]

In the case at hand, Jim contends that Donald loaned him and Carolyn over $500,000.00 during the marriage, mainly to keep afloat an ultimately doomed business venture, Silver Foods. But Jim points to nothing specific in the record to show that he (or Carolyn) was ever obligated to repay any amounts given by Donald. In fact, Jim testified at a deposition that he had signed no notes signifying his obligation to repay Donald. Furthermore, Jim points to nothing to show definitively that Carolyn was aware of the extent and nature of these alleged loans. In short, we do not believe that the trial court abused its discretion in finding that only Jim was obligated to repay the alleged loans.[47]

### 8. The Capital Loss Tax Carry–Forward.

Jim and Carolyn have a capital loss carry-forward[48] of approximately

---

43. *Cochran*, 746 S.W.2d at 569–570.

44. *Neidlinger*, 52 S.W.3d at 522.

45. *Id.* at 523.

46. *Id.*

47. *Neidlinger*, 52 S.W.3d at 523 ("As with issues pertaining to the assignment of marital property, issues pertaining to the assignment of debts incurred during the marriage are reviewed under an abuse of discretion standard.").

48. John Price, a certified public accountant, testified that a capital loss carry-forward "can offset capital gains in the current year.... If they had no capital gains transactions, they—

$413,000.00 stemming from Silver Foods's demise. The trial court ordered that the carry-forward be equally divided between Jim and Carolyn. On appeal, Jim contends that he should have been awarded the entire carry-forward because all of the debt associated with Silver Foods (i.e., the alleged loans from Donald) was deemed to be Jim's sole responsibility.

John Price, however, gave expert testimony that since the parties filed a joint tax return, "we have a joint capital loss carry-forward, and so each person would be entitled to half of the [$]416,000 [sic]." Furthermore, Jim points to nothing to contradict the trial court's finding that Carolyn "provided substantial funds from her nonmarital account to Silver Foods." Thus, as she provided at least some measure of support to Silver Foods from her nonmarital funds, Carolyn should be entitled to reap the benefits of a portion of the carry-forward. As the trial court's decision to split the carry-forward equally is supported by Price's testimony, we cannot find that equally dividing the carry-forward is an abuse of discretion.

### 9. The Kirkland Drive Residence.

■ Carolyn contends that the trial court erred by not finding that she had a nonmarital interest in the parties' Kirkland Drive residence. Shortly before they sold the Forest Drive residence, the parties paid $138,900.00 for the Kirkland Drive residence, for which they made a $38,000.00 down payment. According to Carolyn, Walter gave her $30,000.00 on the day before she and Jim made the down payment, which she contends she used to fund the majority of the down payment.

At the risk of repetition, Carolyn, as the party seeking to classify an item obtained during the marriage as her nonmarital property, bears the burden of proof. In response to that burden, Carolyn has simply shown a temporal proximity between Walter's gift and the down payment being made. Such a close proximity could have led to a conclusion that Walter's gift was used for the down payment if Carolyn had pointed to something specific in the record, such as her deposition testimony, to bolster that temporal coincidence. But since she did not point to anything more concretely linking the gift to the down payment, she has not met her burden.[49] Thus, we must affirm the trial court.

### 10. The Silver Foods Delinquent Tax Bill.

■ Before Silver Foods' demise, Jim voluntarily ceased paying withholding taxes. Carolyn expended approximately $14,000.00 of her nonmarital funds to reimburse the IRS so that Jim would not find himself in greater legal trouble. The trial court found that Carolyn used her nonmarital funds for the marital purpose of protecting Jim from legal action and, consequently, refused to order Jim to reimburse her. On appeal, Carolyn contends that she is entitled to reimbursement.

■ Essentially, Carolyn gave Jim $14,000.00 to help him avoid further IRS entanglements. In determining whether a gift between spouses should be considered marital or nonmarital property upon dissolution, a court must consider:

---

they're able to use [$]3,000 per year of capital loss carry-forward to offset their other income, like salary or interest or dividends. And it has an indefinite carry-forward until it's used up."

49. In fact, Carolyn's brief only states that "[t]he timing of Walter's gift indicates, *almost without question,* that it comprised $30,000.00 of the down payment." (emphasis added).

the source of the money with which the "gift" was purchased, the intent of the donor at that time as to intended use of the property, status of the marriage relationship at the time of the transfer, and whether there was any valid agreement that the transferred property was to be excluded from the marital property.[50]

Although the money given by Carolyn was unquestionably nonmarital, there is no indication that the parties had separated at the time of the gift, nor is there any indication that the parties had agreed that the gift was to be excluded from the marital property (i.e., we have been directed to nothing showing that Carolyn asked Jim to repay the $14,000.00). In short, we believe that the trial court correctly found that the $14,000.00 was a generous, marital gift from Carolyn to Jim.

### 11. Jim's Retirement Fund.

■ The trial court found that Jim's retirement accounts, valued at slightly over $44,000.00, were marital property. But the trial court, after "[c]onsidering the overall division of marital property," awarded all those accounts to Jim. On appeal, Carolyn argues that the trial court erred by not awarding her part of Jim's retirement funds.

As noted previously, the trial court has wide discretion in dividing the marital property in just proportions.[51] Considering the fact that Carolyn was awarded a larger portion of the marital assets, as best shown by the fact that she received the lion's share of the farm, and, furthermore, in light of the fact that Carolyn has a

greater pool of nonmarital property from which to draw,[52] as best evidenced by the large sums awarded her from the UBS account, we simply cannot say that the trial court abused its discretion in awarding Jim the entirety of his modest retirement account.

### C. Maintenance.

■ The trial court denied Jim's request for maintenance because Jim had the education and ability to find work as an attorney and, furthermore, because Jim received a sizeable marital estate, and because he stands to receive a substantial inheritance upon Donald's death. On appeal, Jim renews his request for maintenance.

■ Maintenance is governed by KRS 403.200, which provides that maintenance may be awarded only if the court finds that the party seeking maintenance: "(a) Lacks sufficient property, including marital property apportioned to him, to provide for his reasonable needs; and (b) Is unable to support himself through appropriate employment. . . ." The decision of whether to award maintenance is within the trial court's discretion and we may disturb that ruling only if the trial court abused its discretion or made its ruling based on clearly erroneous findings of fact.[53]

Jim's main contention regarding maintenance is that he should be awarded maintenance in order for him to live in a lifestyle similar to that he enjoyed during his marriage. However, Jim and Carolyn's marital lifestyle was dependent on Carolyn's nonmarital inheritance and gifts, in-

50. *O'Neill v. O'Neill*, 600 S.W.2d 493, 495 (Ky.App.1980).

51. *Cochran*, 746 S.W.2d at 569–570.

52. *Russell*, 878 S.W.2d at 25 (holding that the value of each spouse's nonmarital property is

a proper factor for a trial court to consider when dividing marital property).

53. *Powell v. Powell*, 107 S.W.3d 222, 224 (Ky. 2003).

cluding loans which were forgiven. Jim has been unemployed for several years and still has taken multiple trips to British Columbia for songwriting classes, as well as other trips to attend self-improvement seminars. So Jim would appear to continue the comfortable lifestyle he had during his marriage. Furthermore, Jim's portion of the marital estate (especially his share of the equity in the farm), combined with his nonmarital property (including a sizeable life insurance policy on Donald's life), should enable him to continue his comfortable existence. And Jim's advanced education background should equip him to find suitable employment for a decent wage. So although Jim may not enjoy the same lifestyle he enjoyed during his marriage to Carolyn, he should be able to achieve a reasonable approximation of it.[54] Therefore, we find that the trial court did not abuse its discretion in denying Jim's request for maintenance.[55]

### D. Attorney's Fees.

▅ The trial court ordered Carolyn to pay approximately $30,000.00 of Jim's attorney's fees. On appeal, Jim contends that Carolyn should have been ordered to pay more of his attorney's fees and, unsurprisingly, Carolyn contends that she should not have been required to pay any of Jim's attorney's fees. In fact, Carolyn contends that Jim should have been ordered to pay half of her attorney's fees.

▅ An award of attorney's fees is governed by KRS 403.220, which "authorizes a trial court to order one party to a divorce action to pay a 'reasonable amount' for the attorney's fees of the other party, but only if there exists a disparity in the relative financial resources of the parties in favor of the payor."[56] The decision of whether to make an award of attorney's fees and, if so, the amount of any such award is within the discretion of the trial court and is never mandatory.[57]

Carolyn contends that she should be awarded attorney's fees because Jim's recalcitrance caused her to have to expend more attorney's fees than necessary. Even a cursory review of the record of these appeals, however, reveals that each party bears responsibility for complicating the issues in this case. Additionally, Carolyn clearly has greater financial resources than Jim, which definitively prevents her from receiving attorney's fees.[58] Thus, the trial court correctly denied her claim for attorney's fees.

---

54. *Id.* at 226–227 (Keller, J., dissenting) ("And, as 'few couples can maintain separately the standard of living that they enjoyed as a single household,' even a duchess may discover that it is simply impossible for her to enjoy a post-dissolution lifestyle similar to the one she enjoyed while married to the duke.") (quoting LOUISE E. GRAHAM AND JAMES E. KELLER, 16 KENTUCKY PRACTICE: DOMESTIC RELATIONS LAW, § 16.7 at 10 (2d. ed. West 1997)) (footnote omitted).

55. We are aware that the question of maintenance is dependent upon a prior, proper division of property, both marital and nonmarital. *See, e.g.,* GRAHAM AND KELLER, § 16.3 at 8 ("Because the maintenance statute depends on a prior allocation of marital property, no maintenance award made prior to an equita-

ble division can be upheld."). We are also cognizant of the fact that some property-related issues are being remanded to the trial court for further action. But we do not perceive that the relatively minor redistribution of property that should occur on remand will cause the parties' relative positions to change so drastically as to require an award of maintenance to Jim. Should Jim or Carolyn believe on remand that maintenance is proper, they are, of course, permitted to seek maintenance from the trial court.

56. *Neidlinger,* 52 S.W.3d at 519.

57. *Id.*

58. *Id.*

As for Jim's contention that he should have been awarded more than $30,000.00 in attorney's fees, it is clear that the trial court considered the parties' conduct during the dissolution proceedings and the financial imbalance between them in arriving at the $30,000.00 figure.[59] Accordingly, we cannot say that the trial court's decision falls outside the "wide latitude" given it in such matters.[60] Thus, we will not disturb the trial court's decision regarding attorney's fees.

### IV. CONCLUSION.

Carolyn's motion to strike is denied. For the reasons stated previously, the trial court's decision is reversed and remanded for further proceedings as to Jim's interest in the Massachusetts Mutual second-to-die policy and his interest in the Crummey trust. The forgiveness of the $57,000.00 loan is also remanded to the trial court for distribution in just proportions as a marital asset. Finally, the amount of the loans from Walter to Carolyn and Jim to help with the down payment on the farm shall be amended on remand to $3,996.00 each, not $3,396.00. The trial court's decision is otherwise affirmed as to all other issues.

ALL CONCUR.

---

59. The decree states that "[t]he Court has considered the parties' present resources as well as the fact that this unusual case has required significant expertise on behalf of the legal teams from both sides." Similarly, the amended decree states that "[t]he Court acknowledges each party's conviction that the other is responsible for escalating the cost of this litigation."

60. *Id.* at 520.