**Michelle MATTINGLY (formerly Fidanza), Appellant.**

v.

**John Francis FIDANZA, III, Appellee.**

**No. 2012–CA–001087–MR.**

Court of Appeals of Kentucky.

Sept. 13, 2013.

Steven J. Kriegshaber, Lauren Meschler, Louisville, KY, for appellant.

Scott E. Karem, Louisville, KY, for appellee.

Before LAMBERT, MOORE, and VANMETER, Judges.

## OPINION

LAMBERT, Judge:

Michelle Mattingly (formerly Fidanza) has appealed from the portion of the Old-ham Family Court's findings of fact, conclusions of law, and final decree designating a portion of the UBS financial accounts belonging to her and her former husband, John Francis Fidanza III, as non-marital, as well as from the family court's order denying her motion to alter, amend, or vacate that order. We have carefully considered the record and the parties' arguments, and we agree with Michelle that the family court failed to make sufficient findings of fact to support its decision. Therefore, we reverse the family court's judgment and remand for further proceedings.

Michelle and John were married on May 26, 1989, in New York, and four children were born of the marriage. They separated in November 2010. John filed a petition to dissolve the marriage on December 17, 2010, and requested that the court restore all non-marital property to the parties, equitably divide the marital property and debt, and award him sole custody of their two minor children. John lived in Louisiana and was employed as the Director of Behavioral Health for Southeast Community Health Systems, while Michelle continued to live in Prospect, Kentucky, and worked part-time for her catering business. In her answer, Michelle requested sole custody of the minor children. In his financial disclosure, John claimed in excess of $126,700.00 in cash that he had inherited from his father as non-marital property. During the marriage, the parties had several accounts through UBS Financial Services, Inc. (collectively, "UBS Accounts"), including a joint cash management account ("joint CMA") and John's two Individual Retirement Account ("IRA") accounts.

By order entered January 7, 2011, the family court permitted each party to re-

ceive $20,000.00 from the joint CMA, noting that each party was to pay his or her own living expenses from these funds and that $5,000.00 of each $20,000.00 disbursement was to go to the parties' attorney fees. Later that month, the court entered an order providing that the parties would share joint custody of the minor children. John would provide the primary residence for their son, and Michelle would provide the primary residence for their daughter. In March, the court ordered John to pay Michelle $1,800.00 per month in *pendente lite* maintenance beginning April 1, 2011. On May 11, 2011, Michelle requested another advancement from the joint CMA in the amount of $15,000.00; $10,000.00 was to pay for marital debt and $5,000.00 for attorney fees. The court permitted her to have $4,000.00. By order entered June 15, 2011, the court permitted Michelle to have a final allocation of $6,000.00 from the joint CMA.

The court held a case management conference in June 2011, and by order entered June 16, 2011, the family court entered a limited decree of dissolution dissolving the parties' marriage and reserving all other issues. The same day, the family court entered a separate order related to the matters discussed at the case management conference and scheduled a final trial on all unresolved issues for later that year. The court later permitted the costs of their daughter's private school tuition for her senior year, which was in excess of $10,000.00, to be paid out of the joint CMA.

The court held a trial on October 5, 2011, and one of the witnesses to testify was David Friedman, the parties' financial advisor at UBS Corporate Financial Services. He had been the parties' advisor since June 24, 2004, when the accounts were opened. Mr. Friedman testified that the parties had four accounts: the joint CMA, which had a balance of $65,034.80 at the end of August 2011, and $53,181.49 at the end of September; John's traditional IRA, which had a current balance of $105,641.00; John's simple IRA, which had a current balance of $65,171.95; and Michelle's IRA, which had a current balance of $422.00. There had not been any contributions into either of John's IRAs since 2007. In January 2008, the balance in the joint CMA had been $315,354.52. Mr. Friedman testified that between $117,000.00 and $118,000.00[1] had been deposited in the joint CMA in May 2007; that amount represented funds that had been transferred from John's father's IRA to him as an inheritance. As of April 30, 2007, prior to the deposit of the inherited funds, the joint CMA had a balance of $242,844.00. The only other significant deposit into that account was a $37,465.00 deposit in August 2007. When asked about how the account dwindled to its current balance of approximately $60,000.00, Mr. Friedman stated that there had been significant withdrawals on a regular basis from 2008 to the current date and that the account had been affected negatively by the drop in the stock market in 2008. Mr. Friedman and John discussed the deposit of the approximate $118,000.00 into the joint CMA; Mr. Friedman had not recommended depositing that into the joint account, but had suggested that it should be kept in a separate account in John's name as it was inherited money. John directed that it be deposited into the joint CMA.

Following the trial, Michelle filed her proposed findings of fact and conclusions of law. Related to the UBS Accounts, Michelle set forth the evidence and testimony introduced at trial. She argued that John had not established his claims of a

---

1. We note that the amount deposited was $117,873.12.

non-marital interest in any of the UBS Accounts, that the assets in the IRAs did not include any co-mingled funds, and requested that all four accounts be deemed marital and divided between the parties.

In his post-trial memorandum, John addressed the three separate UBS Accounts; namely, the joint CMA and his two IRAs. Collectively, he stated that the three accounts totaled $248,508.74 as of August 31, 2011. He requested that the amount of his inheritance, $117,873.12, be restored to him as non-marital property because he had demonstrated that the UBS Accounts had never fallen below the amount transferred into them as a result of his inheritance. He argued that he did not have to trace these funds with mathematical certainty. He also argued that the court should credit him from the marital portion of the UBS Accounts to equalize payments given to Michelle and other amounts paid for her.

On February 15, 2012, the family court entered its findings of fact, conclusions of law, and final decree, in which it ruled on the remaining contested issues, including child support, health and life insurance, real property, personal property, automobiles, taxes, debt, maintenance (John was ordered to pay Michelle $2,500.00 per month for 36 months, then $1,500.00 per month for an additional 24 months), and attorney fees (John was ordered to pay $5,000.00 toward Michelle's attorney fees). Regarding the UBS Accounts, the court found as follows:

[John] testified that he maintains a UBS Account which includes a substantial amount of non-marital funds. The uncontroverted testimony was that a substantial portion of these funds were the result of a transfer of an individual retirement account ("IRA") from his father's estate. [John] testified that he did not know into which of the three accounts the IRA funds were deposited.

There are three separate sub-accounts within the UBS Account. There is a cash management account ("CMA Account"); a Traditional IRA; and a Standard IRA. Collectively, this UBS Account has a fair market value of two hundred forty-eight thousand five hundred eight dollars and seventy-four cents ($248,508.74) as of August 31, 2011. [John] contends that one hundred seventeen thousand eight hundred seventy-three dollars and twelve cents ($117,873.12) of these funds should be restored to him as his non-marital property. The uncontroverted testimony at trial was that that amount was received from [John's] father's account as an inheritance and deposited to the UBS Account. It was demonstrated that this account has never fallen below the amount transferred as a result of the inheritance. Thus said amount should remain [John's] sole non-marital property.

The family court then considered the applicable law; namely, that the party claiming that property is non-marital has the burden of establishing this through tracing. The court noted that this tracing did not need to be done with mathematical certainty, citing *Chenault v. Chenault*, 799 S.W.2d 575 (Ky.1990). Because the fair market value of the UBS Accounts did not fall below the amount of the claimed non-marital contribution, the court family restored the entire amount of the inheritance to John, citing *Allen v. Allen*, 584 S.W.2d 599 (Ky.App.1979). The court declared the amount remaining to be marital property and divided it between John and Michelle, but allowed offsets due to prior advances it had made and credits to John for bills that he had paid. In total, the court found that John was entitled to a credit of $22,270.34 from the marital portion of the UBS Ac-

counts. After subtracting John's non-marital interest and credits from the value of the account at the time of the trial, the total to be divided between the parties equaled $108,365.28. Accordingly, $54,182.64 was awarded to Michelle.

Both parties filed motions to alter, amend, or vacate the family court's judgment. In her motion, Michelle disputed the family court's ruling related to the designation and division of the UBS Accounts. She argued that the inherited amount had been deposited into the joint CMA, not either of John's IRAs, which only contained marital funds. Therefore, the court should have declared the funds in the IRAs to be marital funds and equally divided the contents. She argued that *Chenault* was not applicable to this case and that John should have been required to trace his claimed non-marital interest with mathematical certainty. If the court were to hold that John met his burden, he was only entitled to one-third of the remaining balance of the joint CMA; the remaining balance should be deemed marital and equally divided between them. Michelle reasoned that when the inheritance was added to the joint CMA, it equaled one-third of the total amount, so that should be what John was entitled to receive as his non-marital property.

By order entered May 22, 2012, the family court adjusted its judgment to increase the amount Michelle would receive from the UBS Accounts based upon her marital equity in John's automobile. The court also addressed the division of the 2010 federal tax refund. Otherwise, it reaffirmed its judgment. This appeal follows.

On appeal, the sole issue Michelle raises is whether the family court properly classified and distributed the funds in the UBS Accounts. She continues to argue that John failed to meet his burden of proof on his non-marital claim and that the family court's findings about these accounts are not supported by substantial evidence. In his brief, John contends that based upon the circumstances of this case, including Michelle's misconduct related to the parties' finances, equity supported the family court's decision to restore the entire amount of his inheritance to him.

Kentucky Rules of Civil Procedure (CR) 52.01 provides the general framework for the family court as well as review in the Court of Appeals: "In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specifically and state separately its conclusions of law thereon and render an appropriate judgment[.] ... Findings of fact, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Specifically for this case, the parties agree that the applicable standard of review is set forth in *Rearden v. Rearden*, 296 S.W.3d 438, 441 (Ky.App.2009):

In determining whether an item has been properly designated as either marital or non-marital property, we first consider the trial court's factual findings, to which we give deference because the trial court was in the best position to judge the credibility of the witnesses and the weight of the evidence. *Smith v. Smith*, 235 S.W.3d 1, 6 (Ky.App.2006). Once we have determined the trial court did not commit clear error in reaching its findings of fact, we review *de novo* the trial court's ultimate legal classification of whether the property was marital or non-marital. A finding of fact is clearly erroneous if it is unsupported by substantial evidence which is defined as proof sufficient to induce conviction in the mind of a reasonable person. *B.C.*

*v. B.T.*, 182 S.W.3d 213, 219 (Ky.App. 2005).

With this standard in mind, we shall consider Michelle's argument.

■ First, Michelle contends that the family court's findings of fact related to the UBS Accounts and John's non-marital tracing were not supported by substantial evidence. She argues that the findings related to the UBS Accounts were incomplete and inaccurate because the family court failed to make any findings related to the previous and current values of the three sub-accounts or any of Mr. Friedman's undisputed testimony related to the descriptions of those accounts and into which account the inheritance was deposited. The only findings the family court made were related to the current (as of August 31, 2011) collective value of the UBS Accounts ($248,508.74), the amount of John's inheritance ($117,873.12), and testimony that the balance of the UBS Accounts had never fallen below the amount of the inheritance.

We must agree with Michelle that the factual findings the family court made on this issue were lacking; the family court failed to make any findings related to the actual account into which the inherited funds were deposited or the balance in that account at the time of the hearing. Therefore, we must remand this matter to the family court to enter proper findings of fact and to then determine the proper designation and division of the UBS Accounts by applying the appropriate law to those facts.

On remand, the family court must closely follow the law related to tracing requirements in determining how to designate the funds in the UBS Accounts, particularly from the joint CMA, and we shall set out the applicable law. Kentucky Revised Statutes (KRS) 403.190(1) says that "the court shall assign each spouse's property to him. It also shall divide the marital property without regard to marital misconduct in just proportions considering all relevant factors[,]" and there is a presumption that "[a]ll property acquired by either spouse after the marriage and before a decree of legal separation is presumed to be marital property[.]" KRS 403.190(3). However, this presumption may be overcome by showing that the property at issue was acquired in a method enumerated in KRS 403.190(2), including "[p]roperty acquired by gift, bequest, devise, or descent during the marriage and the income derived therefrom unless there are significant activities of either spouse which contributed to the increase in value of said property and the income earned therefrom[.]" KRS 403.190(2)(a).

■ With the statutory requirements of KRS 403.190 in mind, the Supreme Court of Kentucky extensively addressed the classification and division of property in *Sexton v. Sexton*, 125 S.W.3d 258, 264–65 (Ky.2004). The Court explained that "[u]nder KRS 403.190, a trial court utilizes a three-step process to divide the parties' property: '(1) the trial court first characterizes each item of property as marital or nonmarital; (2) the trial court then assigns each party's nonmarital property to that party; and (3) finally, the trial court equitably divides the marital property between the parties.'" *Id.* at 264–65 (footnote omitted). A particular item of property might consist of both marital and non-marital components, which would require the court to "determine the parties' separate non-marital and marital shares or interests in the property on the basis of the evidence before the court." *Id.* at 265 (footnote omitted). In order to do this, the court must apply the "source of funds" rule to characterize the property or the parties' interests in it as marital or non-marital. *Id.* (Footnote omitted). The Court made it

clear that "[n]either title nor the form in which property is held determines the parties' interests in the property[.]" *Id.*

The *Sexton* Court went on to explain the concept of tracing as it applies to the determination of whether property, or some portion of it, is marital or nonmarital:

"Tracing" is defined as "[t]he process of tracking property's ownership or characteristics from the time of its origin to the present." In the context of tracing nonmarital property, "[w]hen the original property claimed to be nonmarital is no longer owned, the nonmarital claimant must trace the previously owned property into a presently owned specific asset." The concept of tracing is judicially created and arises from KRS 403.190(3)'s presumption that all property acquired after the marriage is marital property unless shown to come within one of KRS 403.190(2)'s exceptions. A party claiming that property, or an interest therein, acquired during the marriage is nonmarital bears the burden of proof.

*Sexton,* 125 S.W.3d at 266 (footnotes omitted). In *Polley v. Allen,* 132 S.W.3d 223, 229 (Ky.App.2004), this Court also addressed the tracing requirement:

A claimant cannot meet the tracing requirement simply by showing that he or she brought non-marital property into the marriage without also showing that he or she has spent his or her nonmarital assets in a traceable manner during the marriage. Under such circumstances, the trial court will not assign the property to the claimant as nonmarital property, but it may consider non-marital contribution as a factor when it makes a just division of the parties' marital property. [Footnote omitted.]

In *Allen v. Allen, supra,* this Court created a tracing rule specifically for cash, holding that "the requirement of tracing should be fulfilled, at least as far as money is concerned, when it is shown that nonmarital funds were deposited and commingled with marital funds and that the balance of the account was never reduced below the amount of the nonmarital funds deposited." 584 S.W.2d at 600. The Supreme Court carved out another exception to the tracing requirement in *Chenault* not requiring such precise, mathematical certainty when a party is not a skilled business person. 799 S.W.2d at 578.

The *Chenault* Court also discussed *Allen,* apparently questioning its holding:

In *Allen v. Allen, supra,* the Court of Appeals retreated somewhat from its earlier decisions and held that "the requirement of tracing should be fulfilled, at least as far as money is concerned, when it is shown that nonmarital funds were deposited and commingled with marital funds and that the balance of the account was never reduced below the amount of the nonmarital funds deposited." *Id.* at 600. The view expressed in *Allen* is consistent with the concurring opinion of Vance, J., in *Turley v. Turley, supra* [562 S.W.2d 665 (Ky.App.1978)]. In that concurring opinion, it was persuasively argued that all nonmarital property should be restored upon dissolution of the marriage providing the parties have, throughout the marriage, maintained at least as much in assets as the combined value of their nonmarital property. By logical inference, if this view were adopted, any decrease during the marriage in the parties' total nonmarital asset value would be charged *pro rata* against their percentage share of total nonmarital property to be assigned.

As appealing as the foregoing view may be, particularly when the simplicity of its application and its inherent equity is considered, we believe the concept of tracing is too firmly established in the law to be abandoned at this time.

Accordingly, we shall adhere to the general requirement that nonmarital assets be traced into assets owned at the time of dissolution, but relax some of the draconian requirements heretofore laid down. We take this position, in part, in reliance upon the trial courts of Kentucky to detect deception and exaggeration or to require additional proof when such is suspected.

*Chenault*, 799 S.W.2d at 578–79. However, the Supreme Court did not overrule *Allen*'s holding that the tracing of cash is met "when it is shown that nonmarital funds were deposited and commingled with marital funds and that the balance of the account was never reduced below the amount of the nonmarital funds deposited." *Allen*, 584 S.W.2d at 600. Therefore, this holding appears to still be good law in the Commonwealth.

However, the family court failed to make any findings related to the particular account into which the inheritance was deposited or what that account's balance was at the time of dissolution, but instead improperly lumped all of the separate UBS Accounts together to find that the balance of the total amount did not fall below the amount of John's inheritance. *Allen* refers only to the balance of the particular account, not to the totality of the parties' accounts or even the totality of their assets at the time of dissolution. On remand, the family court must make findings on these questions and determine, based upon the evidence of record, into which account the inheritance was deposited and the balance of that particular account at the time of dissolution, and then determine what amount, if any, may be restored to John as his non-marital, inherited property.

For the foregoing reasons, the judgment and order of the Oldham Family Court are reversed, and this matter is remanded for further proceedings in accordance with this opinion.

ALL CONCUR.