John Fred ALLISON, Appellant

v.

Vicki Lynn ALLISON, Appellee.

Nos. 2006–CA–001967–MR,
2006–CA–002575–MR.

Court of Appeals of Kentucky.

Feb. 15, 2008.

Anita M. Britton, Crystal Osborne, Lexington, KY, for appellant.

W. Stokes Harris, Jr., Lexington, KY, for appellee.

Before THOMPSON, Judge; BUCKINGHAM and HENRY, Senior Judges.[1]

---

1. Senior Judges David C. Buckingham and Michael L. Henry sitting as special judges by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and Kentucky Revised Statute (KRS) 21.580.

*OPINION*

BUCKINGHAM, Senior Judge.

John Fred Allison appeals from orders and judgments of the Fayette Circuit Court, Family Branch, relating to the resolution of issues in a dissolution of marriage action that he filed against Vicki Lynn Allison. John appeals from the court's rulings regarding the marital/nonmarital nature of his family's business, the marital/nonmarital nature of a $66,714 debt allegedly owed by Vicki to her mother, and the award of attorney and expert witness fees. We affirm in part and vacate in part and remand.

John and Vicki were married on September 5, 1986. They had one child, Courtney, who is now emancipated. John filed a dissolution of marriage action on June 29, 2004. The court held hearings and issued a decree and several orders. John's dissatisfaction with the court's rulings on the aforementioned three issues is the subject of this appeal.

In the early 1970's, John's mother and father acquired all stock in a business known as Action Business Suppliers, Inc. (ABS). John now owns all shares of stock in ABS, and he claims that the shares are his nonmarital property. He first states that in August 1984 (prior to his marriage to Vicki), he entered into an employment and stock option agreement with his parents that gave him the right to acquire an 8% interest in ABS. He acknowledges that this option was not exercised. Rather, he maintains that in April 1986 (four months prior to the marriage), he entered into a new agreement that continued the terms of his employment and gave him a 16% interest in the business in exchange for a promissory note from him for $32,000.

John never paid the note, and the court found that his father had forgiven the debt. John contends that he owns this portion of the outstanding ABS shares as his nonmarital property because the forgiveness of the debt constituted a gift to him. Alternatively, he contends that this ownership interest is his nonmarital property because he acquired it before marriage.

As to the remaining shares of corporate stock, in December 1996, there was a stock redemption agreement between John's parents and the corporation whereby they sold their 84,800 shares of ABS stock to the corporation for $1,152,125 to be paid to them over a ten-year period. The court found that this amount had been paid in full over a period of years by the corporation. John claims that these shares were also his parents' gift to him and that he never paid any money, from marital funds or otherwise, for the stock.

The court found that all shares of stock were acquired during the marriage and that John had not provided adequate proof to overcome the presumption that his entire interest, or even any interest, in ABS was marital. The court specifically rejected testimony that the 84,800 shares of stock were a gift to John from his parents. Rather, the court found that John's parents had been paid over $1 million by the corporation for those shares.

The court noted that John had initially stated that he and his parents had agreed he would purchase their shares of stock and become full owner, but that he later recanted that statement and stated the shares were a gift. Further, John's father had stated that the shares were a gift to John and that he had made similar gifts to other children. However, the court noted

that there was no proof of such similar gifts.

In determining that all shares of stock owned by John were marital property, the court found that "in the present case the ownership interest increased from either 0%, 8%, or 16% to 100%. The value of his interest increased this much as well. Regardless, the Husband failed to prove by documents or evidence what interest he acquired before marriage or by gift, and the Court[']s only real proof is that he paid for the stock after 1996." [2]

John first argued in his brief that he has at least a 16% nonmarital interest in ABS. He asserted that he acquired such interest by agreement with his parents in April 1986 (before the marriage) and that his father later forgave the payment of the $32,000 promissory note that John had given in return. In fact, the court specifically found that the indebtedness had been forgiven. Thus, John claims that such interest was a gift to him and was therefore nonmarital and that the court erred in not so finding. In support of this argument, John cited KRS 403.190(2)(a) which expressly excludes property acquired by gift from the definition of "marital property" unless "there are significant activities of either spouse which contributed to the increase in value of said property and the income earned therefrom."

Alternatively, John stated that the 16% interest is nonmarital because it was acquired before marriage. He cited *Overstreet v. Overstreet*, 144 S.W.3d 834, 837 n. 7 (Ky.App.2003), to support that argument. In his oral argument before the court, John's attorney modified John's position and stated that John only owned an 8% interest, not a 16% interest, in the corporation prior to the 1996 redemption agreement.[3]

---

2. The court later amended its findings to state that the corporation (not John) had purchased John's parents' shares of stock pursuant to the redemption agreement.

3. The corporation was authorized to issue 100,000 shares. The redemption agreement states that there were 92,000 shares outstanding, of which 84,800 were sold by John's

The court stated in an order amending its original ruling that John's father "forgave the original $32,000 which was due for a 16% interest in the business pursuant to an alleged agreement in 1986. This change however does not change the Court's finding that the business is marital property." The court did not explain its ruling in this regard and did not make more specific findings. While the court said that John's father forgave the debt, it did not make any finding that the 16% interest was a gift or even that John owned a 16% interest. In fact, as we have noted, the court stated that John had failed to prove "what interest he may have acquired before marriage or by gift." [4] At any rate, John now claims that his interest in the corporation prior to the redemption agreement was 8% rather than 16%.

■ The first issue, therefore, is whether John had no ownership interest in the corporation at the time his parents sold all their shares to the corporation or whether he had an 8% interest. We conclude that the facts indicate John must have had an ownership interest at the time of the redemption agreement. Otherwise, there would have been no interests owned by anyone once John's parents sold their shares back to the corporation. Further, we conclude that the evidence appears to support only an ownership interest of 8%.[5]

■ The next issue concerns when John acquired that interest and whether that interest was marital or nonmarital. The burden was on John to prove any nonmari-

tal interest in the family business. *See Sexton v. Sexton*, 125 S.W.3d 258, 266 (Ky. 2004). *See also Smith v. Smith*, 235 S.W.3d 1, 16 (Ky.App.2006). The trial court determined that John failed to meet that burden.

■ John claims he acquired that interest pursuant to the 1986 agreement. The court found that the payment of the indebtedness represented by the note had been forgiven. The court also stated that the note was for payment of a 16% interest in the corporation. If, in fact, John acquired his ownership interest in exchange for the note, and that indebtedness was later forgiven, then it would appear that the forgiveness of the indebtedness would be a gift to John and would constitute a nonmarital interest in the corporation.[6] *See* KRS 403.190(2)(a).

■ For this reason, we conclude that the court's ruling contains some inconsistency that we are unable to explain. Thus, we vacate the trial court's determination that John did not have a nonmarital interest in the corporation and remand the matter for the court to determine the extent of John's interest prior to the redemption agreement (which appears to us to be 8%) and whether such interest was marital or was proven by John to be nonmarital as a result of a gift or nonmarital as having been acquired before marriage.

Concerning the stock redemption agreement and whether the redeemed shares of stock constituted John's nonmarital prop-

---

parents back to the corporation. Of the remaining 15,200 shares, John apparently claims that he owned 7,200 (7.8%, not 8%, of all outstanding shares) of them at the time, although he had not been issued share certificates, and that the remaining 8,000 shares were never issued.

4. Although John claimed in his brief that he purchased a *16%* interest in the corporation in 1986, he never received any shares of stock

representing that interest. There was no ABS stock in John's name prior to the 1996 stock redemption agreement.

5. A 1993 corporate tax return shows John having an 8% ownership interest.

6. Alternatively, if the forgiveness of the note was a gift, it could have been a gift to both John and Vicki, rather than a gift to John only. *See Sexton*, 125 S.W.3d at 267–70.

erty, that issue will be moot unless the court determines that John's interest prior to the redemption was nonmarital. If the court determines that John's interest at that time was marital, then any increase in ownership interest because of the redemption agreement was also necessarily marital.[7]

If the court determines upon remand that John's interest prior to the redemption was nonmarital, then it must determine whether any increase in value was marital or nonmarital. John and Vicki agree that this case is one of first impression in Kentucky. Both have cited cases from other jurisdictions that have addressed similar fact situations. While we will decide this issue under principles of Kentucky law, an overview of these cases is appropriate.

John relies primarily on *Hoffmann v. Hoffmann*, 676 S.W.2d 817 (Mo.1984). In that case, the Missouri Supreme Court rejected a wife's claim that the husband's increase in his ownership interest in a closely-held corporation after marriage resulted in the increase being marital property. The husband's father owned a corporation, and the husband acquired a 16.17% interest prior to the marriage. After husband and wife were married, the corporation purchased and retired some of the shares owned by the father. The result of the stock redemption was that husband's ownership interest increased to 35.3%. Husband then gave some shares to his son and one share to a newly hired corporate officer. The result was that the husband owned a 29.5% interest.

First, the court rejected the wife's argument that the increase in ownership percentage was marital property. *Id.* at 823. Based on a Missouri statute, Mo.

Rev.Stat. 452.330.2(2),[8] the court stated that the increase was the husband's separate property because it was "property acquired during marriage in exchange for property acquired prior to marriage." *Id.* at 822. The court reasoned that "the 16 percent ownership interest acquired prior to the husband's marriage was merely exchanged for a larger ownership percentage of a corporation that was worth less." *Id.* The court analogized the situation to one involving a stock split. *Id.* Thus, the court rejected "the wife's contention that the increase of percentage of ownership of the corporation transformed a portion or all of the husband's stock to marital property." *Id.* at 823.

Second, the court rejected the wife's argument that the increase in ownership was marital property because marital funds were expended to redeem the father's stock. *Id.* Although the court recognized that a lien against the separate property could arise had marital funds been expended, it held there was no evidence that corporate funds that would otherwise have been used to pay the husband's salary or dividends were used to redeem the stock. *Id.*

The court also rejected the wife's argument that the increase in value of the husband's ownership interest was partially due to her efforts as a homemaker, traveling companion, and entertainer. *Id.* at 826. The court reasoned that "she made no substantial financial contributions to the business nor were her personal contributions sufficiently extensive to warrant additional compensation by sharing in the husband's separate property." *Id.*

As for the wife's arguments that the marital efforts of the husband led to the

---

7. The trial court determined that these redeemed shares were not a gift to John, and John did not appeal from that portion of the court's order.

8. This statute is identical to KRS 403.190(2)(b).

increase in value of the ownership interest, the court stated that the husband had been compensated by the corporation with salary, bonuses, and dividends in which the wife shared and that "the unusual growth and prosperity of the company was directly attributable to the unforeseen but salutary (for the corporation) consequences of federal and state legislative enactments vis-a-vis sole efforts of the husband." *Id.* The court also stated that "it would require substantial speculation to conclude that the stock's value had appreciated in any amount due to the husband's forsaking marital property compensation for his services." *Id.*[9]

In citing cases from other jurisdictions on this issue, Vicki first cites *Smith v. Smith,* 197 W.Va. 505, 475 S.E.2d 881 (1996). In that case, the husband owned a 28% interest in an independent insurance agency that was a closely-held family business prior to the marriage. Following the marriage, the corporation purchased the shares of one of the shareholders, resulting in the husband's ownership interest increasing from 28% to 44%. While the trial court determined that the increase in ownership interest was nonmarital property, the West Virginia Supreme Court reversed the trial court and held that any "active appreciation" in husband's interest would be marital property and that husband's full-time efforts as officer or director together with significant stock ownership created at least some degree of "active appreciation" and, therefore, marital property interest. *Id.* at 888.

Vicki also cites *McLeod v. McLeod,* 74 N.C.App. 144, 327 S.E.2d 910 (1985), *overruled on other grounds by Johnson v. Johnson,* 317 N.C. 437, 346 S.E.2d 430, 440 n. 4 (1986), in support of her argument. In *McLeod,* the husband inherited 30% of a closely-held corporation during the marriage. Thereafter, the corporation purchased all its outstanding shares, resulting in the husband becoming the sole shareholder. As for the 30% of stock inherited by the husband, the court held that the shares were his separate property. *Id.* at 914. However, the court further held that any increase in value of that interest due to "active appreciation" was marital property. *Id.* Also, the court held that the redemption of the remaining outstanding shares resulted in "active appreciation" of the husband's stock and "was a business decision from which plaintiff as president derived substantial economic advantage which, in terms of our statute and cases, is property acquired during the marriage." *Id.* at 915.

In Kentucky, all property acquired by either party during the marriage is presumed to be marital property. KRS 403.190(3). However, this presumption may be overcome by a showing that the property was acquired by one of the methods stated in KRS 403.190(2).

John argues that the shares of stock acquired in the 1996 stock redemption were excepted from the definition of marital property because they were "[p]roperty acquired in exchange for property acquired by gift, bequest, devise, or descent." *See* KRS 403.190(2)(b). He reasons that his "16% ownership [which he now states is only 8%] was exchanged for a 100% interest. Therefore, [his] entire 100% interest in ABS is non-marital." He relies on the reasoning of the Missouri Supreme Court in the *Hoffmann* case.

John explains that "the Allisons were careful to leverage the redemption to insure that there would be no appreciable change in ABS' value." He then argues

9. John also cites *Watkins v. Watkins,* 924 S.W.2d 542 (Mo.App.1996), to support his argument. In that case the Missouri Court of Appeals followed the holding of the Missouri Supreme Court in *Hoffmann. Id.* at 546. We will not discuss herein the facts in that case.

that "[s]ince there was no appreciable increase in the value of ABS during redemption, its only effect on John was to increase his percentage of ownership." Thus, he concludes that "[b]ecause this is nothing more than an exchange of non-marital property, KRS 403.190 demands that 100% of ABS be attributed to John as non-marital property."

■ In *Travis v. Travis*, 59 S.W.3d 904 (Ky.2001), the Kentucky Supreme Court stated

An item of property will often consist of both marital and nonmarital components, and when this occurs, a trial court must determine the parties' separate nonmarital and marital shares or interests in the property on the basis of the evidence before the court. Kentucky courts have typically applied the "source of funds" rule to characterize property or to determine parties' nonmarital and marital interests in such property.

*Id.* at 909. Further, "[t]he 'source of funds rule' simply means that the character of the property, i.e., whether it is marital, nonmarital, or both, is determined by the source of funds used to acquire property." *Id.* at 909 n. 10. *See also Sexton*, 125 S.W.3d at 265.

■■ Under the "source of funds" rule used by Kentucky courts and courts in other states to determine whether property is marital or nonmarital, "[t]he property is considered to be acquired as it is paid for...." *Hoffmann*, 676 S.W.2d at 824. "[C]haracterization of property as nonmarital or marital depends upon the source of each contribution as payments are made rather than the time at which equitable title to possession of the property is obtained." *Harper v. Harper*, 294 Md. 54, 448 A.2d 916, 929 (1982).

■ Under this analysis, the shares of stock sold to the corporation in the 1996 stock redemption agreement were not "acquired", within the meaning of KRS 403.190 and the determination of marital/nonmarital interest, until they were paid for. These shares were paid for during the marriage over a period of years by corporate earnings. Thus, they were "acquired" during the marriage.

Because the shares were "acquired" during the marriage, there is a presumption that they are marital property. *See* KRS 403.190(3). John seeks to avoid the presumption by arguing that he exchanged his 16% (or 8%) interest for a 100% interest when the stock redemption occurred. He relies on KRS 403.190(2)(b).

It is true, as John argues, that the value of his ownership interest did not increase at the time of the stock redemption because while the percentage of ownership interest increased, the value of the corporation decreased because of the debt liability created to pay John's parents for their shares. *See Hoffmann*, 676 S.W.2d at 822. Although John's ownership interest at the time of the redemption of his parents' shares increased, the value of John's shares did not. Rather, the value of John's shares increased during the marriage as the corporation gradually paid the debt to John's parents. The real issue is how to treat the subsequent increase in the value of John's shares (assuming those shares were nonmarital) as the debt to John's parents was paid.

In *Goderwis v. Goderwis*, 780 S.W.2d 39, 40 (Ky.1989), the Kentucky Supreme Court addressed a somewhat similar situation. In that case, the husband owned an auto repair garage business prior to marriage. During the course of the parties' 18–year marriage the value of the corporation grew substantially. The husband argued that the corporation was his non-marital property because he was the corporation and his wife took no active role in the operation of the business. Rather,

she cared for the parties' four children and was a homemaker.

Our supreme court stated that there was "a certain amount of confusion on the question of how to treat business property which is the primary occupation of one spouse during the marriage but which was acquired prior to marriage when it increases in value during the marriage." *Id.* at 40. The court stated that although the business was the principal source of the marital funds, the wife could contribute to the marital assets in her role as a homemaker.[10] *Id.* The court further held that

An increase in value of nonmarital property during the marriage which is the result of a joint effort of the parties establishes the increase in value of the nonmarital property as marital property. The efforts of the parties may include the contribution of one spouse as a primary operator of the business and the other spouse as primarily a homemaker.

*Id.*

■ We believe that the principles in *Goderwis* are applicable herein. John may have had a nonmarital interest in the corporation at the time of marriage.[11] The value of that interest likely increased in time as the years passed and the corporation paid off the debt owed to John's parents. To the extent the increase was due to John's efforts as the primary operator of the business and Vicki's efforts as homemaker, it was marital property. *See id.* However, to the extent the increase in value was due to general economic conditions, the increase was not marital property. *See id.*

KRS 403.190(3) creates a presumption that any increase in value in property acquired during the marriage is marital property. In the *Travis* case, the Kentucky Supreme Court stated as follows:

[T]herefore, a party asserting that he or she should receive appreciation upon a nonmarital contribution as his or her nonmarital property carries the burden of proving the portion of the increase in value attributable to the nonmarital contribution.

59 S.W.3d at 910. Further, "[b]y virtue of the KRS 403.190(3) presumption, the failure to do so will result in the increase being characterized as marital property." *Id.* at 910–11.

■ To summarize, on remand the court must first determine the interest that John had in ABS prior to the redemption agreement and whether that interest was marital or nonmarital. If that interest is determined to be martial, then any increase in its value must necessarily also be marital. If that interest is determined to be nonmarital, then the court must determine whether the increase in its value during the marriage is marital or nonmarital. In making this determination, if the value of the interest increased due to general economic conditions, then the increase is John's nonmarital property. *See Goderwis*, 780 S.W.2d at 40. If the value of the interest increased due to the joint efforts of the parties, then the increase is marital property.[12] *Id.* Because KRS 403.190(3) creates a presumption that the increase is marital property, the burden is on John to prove that the increase in value is nonmar-

---

10. This view is contrary to the *Hoffmann* case where the court rejected the wife's argument that the increase in value of her husband's ownership interest in a closely-held corporation was partially due to her efforts as a homemaker, traveling companion, and entertainer. *See Hoffmann*, 676 S.W.2d at 826.

11. The trial court will make this determination on remand.

12. As we have noted, the efforts of the parties may include the contribution of John as the primary operator of the business and the contribution of Vicki as primarily a homemaker. *See Goderwis*, 780 S.W.2d at 40.

ital. *See Travis,* 59 S.W.3d at 910. If he fails to prove that the increase in value of his nonmarital interest (if he had a nonmarital interest) was his nonmarital property, then he should be awarded only the value of the nonmarital interest at the time he acquired it or at the date of marriage, whichever date is later, as his nonmarital property.

John's second argument is that the court erred in finding that checks from Vicki's mother written to Vicki after she and John separated constituted a marital debt. After the parties separated, Vicki was awarded $2,000 per month for temporary maintenance and $1,000 for child support. Thereafter, as power of attorney for her mother, Vicki wrote checks totaling $66,714 on her mother's checking account. Some of the checks were written before the maintenance and child support awards to Vicki, and some were written after the awards. Of this amount, $27,300 in checks apparently were written to Vicki herself for cash.

Vicki claims that all the checks were loans from her mother that were needed because she could not meet her living expenses despite her maintenance award of $3,000 per month. She claims that much of the money went for home maintenance and repair and that the remainder went for living expenses for her and her daughter, who was a senior in high school at the time.[13]

John was not aware of the alleged loans, and he argues that the checks were likely to be gifts from Vicki's mother and that Vicki's testimony that the checks were loans and the notations of "loan" on some of the checks were insufficient to prove the existence of a loan. In support of his argument, John cites *Bodie v. Bodie,* 590 S.W.2d 895 (Ky.App.1979), and *Neidlinger*

*v. Neidlinger,* 52 S.W.3d 513 (Ky.2001). Further, John states that the court's finding that "[m]ost if not all of the money loaned from the mother was used to make improvements on the marital residence which is part of the marital estate" is simply untrue and, therefore, an erroneous fact finding.

In the *Bodie* case, this court affirmed the trial court's ruling that debts of $14,610 incurred by the husband during the marriage were not marital debts but were debts that should be assigned solely to the husband. *Id.* at 896. The court noted that there is no presumption whether debts arising during the marriage are marital or nonmarital and that the burden of proof that the debt is marital is upon the party that incurred it. *Id.*

While we agree with John that the court in *Bodie* accurately stated the law, we disagree that the facts therein have similarity to those in this case. In *Bodie,* the husband, who had incurred the debt, declined to answer questions relative to the nature of the debts. Further, he offered no canceled checks, bills, or receipts to support his claim that the debts were marital in nature. In this case, Vicki testified as to the nature of the debts and had documentation in the form of checks from her mother that supported her testimony that there was actually a loan.

In the *Neidlinger* case, the Kentucky Supreme Court affirmed a trial court's ruling that a $26,000 indebtedness from a wife to her mother and two friends was the separate debt of the wife and was thus nonmarital. *Id.* at 523. First, the court stated as follows:

> Debts incurred during the marriage are traditionally assigned on the basis of such factors as receipt of benefits and

---

**13.** Vicki also presented evidence of $8,000 in checks from her mother that were written prior to the parties' separation. The court did not allow this amount as a marital debt.

extent of participation, whether the debt was incurred to purchase assets designated as marital property, and whether the debt was necessary to provide for the maintenance and support of the family. (Citations omitted.)

*Id.* The *Neidlinger* court held that the debt was "incurred primarily for Appellant's own benefit and secondarily to maintain the parties' child in an expensive school to which the Appellee objected." *Id.*

In reviewing the determination by the trial court, the supreme court in *Neidlinger* held that "issues pertaining to the assignment of debts incurred during the marriage are reviewed under an abuse of discretion standard." *Id.* The court further stated that "[i]f the[ ] debts were assigned to Appellee [husband], the effect would be to allow Appellant to unilaterally increase Appellee's maintenance and support obligation to a level substantially higher than established by court order." *Id.*

We conclude that *Neidlinger* is distinguishable from the facts of this case in at least three ways. First, in *Neidlinger* the supreme court stated that the debt was primarily for the wife's benefit and secondarily for the education of the parties' daughter in an expensive private school pursuant to the wife's unilateral decision. In this case, much of the expense went for maintenance and repairs of the marital residence. Second, in *Neidlinger*, the court was faced with whether the lower court's decision declaring the debt to be nonmarital was an abuse of discretion, while in this case we are faced with whether the lower court's decision declaring the debt *not* to be nonmarital was an abuse of discretion. Third, in *Neidlinger*, the court held that to assign the debt to the husband would, in effect, increase his maintenance obligation. In this case, the court did not

assign the debt to John but assigned it to Vicki.

The trial court in this case accepted Vicki's claim of indebtedness to her mother based on her testimony and copies of the checks. We conclude that the evidence was sufficient to support the determination that the checks represented loans, not gifts. We decline to tamper with that portion of the court's ruling.

However, in determining that the loans were a marital debt, the court stated that "[m]ost if not all of the money loaned from the mother was used to make improvements on the marital residence which is part of the marital estate." According to Vicki's own exhibit introduced into evidence at trial, that was not the case. Thus, the trial court made an erroneous fact finding in that regard.

We agree that the portion of the debt that related to improvements to and maintenance of the marital residence could be held to be a marital debt. Likewise, loans to cover valid living expenses incurred by Vicki prior to the maintenance and child support awards were within the court's discretion to allow. However, to the extent that Vicki may have used loan proceeds for her personal expenses and expenses for her child after being awarded temporary maintenance and child support, those debts should be held to be Vicki's personal debts. To do otherwise would be to increase John's temporary maintenance and child support obligations during that period of time. *See Neidlinger*, 52 S.W.3d at 523. We remand the matter to the trial court to determine what part of the $66,714 should be excluded pursuant to the principles of the *Neidlinger* case.

John's third and final argument is that the court erred in ordering him to pay 25% of Vicki's attorney fees and expert witness fees. Vicki's attorney fees were slightly less than $40,000. Thus, the court ordered

John to pay Vicki's attorney $10,000. Vicki also incurred accounting fees, and the court ordered John to pay her $6,922.19 of those fees.

■ Attorney fees may be awarded to a party pursuant to KRS 403.220. Expert witness fees may also be awarded pursuant to that statute. *See Culver v. Culver,* 572 S.W.2d 617, 622 (Ky.App.1978). The statute states that the court should consider "the financial resources of both parties[.]" KRS 403.220. Further, the statute states that the court may award a "reasonable amount" for the fees. *Id.* An award of fees is reviewed by this court under an abuse of discretion standard. *Neidlinger,* 52 S.W.3d at 520.

John's first argument in this regard is that the court erred in awarding fees because there was not an imbalance in the financial resources of the parties. To support his argument, John cites *Lampton v. Lampton,* 721 S.W.2d 736 (Ky.App.1986), wherein this court held that attorney fees may be awarded "only when it is supported by an imbalance in the financial resources of the respective parties." *Id.* at 739.

John states that he was awarded $1,584,087 in marital property, that Vicki was awarded $1,000,845, and that he was ordered to pay Vicki $291,621 in a lump sum to equalize the property distribution. Further, he states that the majority of his assigned marital property ($1.2 million) was the family business. Further, John notes that Vicki was awarded the marital residence unencumbered, as well as checking, savings, and investment accounts. He thus argues that "there is no appreciable financial disparity between John and Vicki."

On the other hand, Vicki asserts that while John has a salary of over $100,000 per year, as well as potentially more due to retained corporate earnings not paid by the corporation, she was 55 years old at the time, had been out of the work force for 10 years, and had only a high school education. She states that although the marital property was divided equally, the financial resources of the parties were not balanced due to these additional facts.

John also correctly states that the court made no specific finding that there was an imbalance in the financial resources of the party, but that it appeared to base its award on John's obstructive tactics in failing to comply with discovery requests and orders of the court. John did not move the court to make a more specific finding in that regard. *See* Kentucky Rule of Civil Procedure (CR) 52.04. Vicki argues that John thus waived the issue for purposes of this appeal because he didn't move the court for a specific finding. *See Underwood v. Underwood,* 836 S.W.2d 439, 445 (Ky.App.1992), *overruled on other grounds by Neidlinger,* 52 S.W.3d at 523.

Also, John cites the *Lampton* case for his argument that attorney fees may be awarded pursuant to KRS 403.220 only when there is an imbalance in the parties financial resources, even though attorney fees may be warranted otherwise under CR 37.01 due to obstruction tactics. *Lampton,* 721 S.W.2d at 739. John notes that pursuant to *Gentry v. Gentry,* 798 S.W.2d 928 (Ky.1990), attorney fees may be awarded under KRS 403.220 for fees incurred due to the obstructive behavior of the other party, but such fees must also be based on the financial disparity of the parties' resources. *Id.* at 937–38.

■ It is not entirely clear whether the court also based its award of attorney fees under KRS 403.220 on the financial resources of the parties as well as John's obstructive tactics. While the court did not specifically address the parties' financial resources prior to making the award, it did cite the statute, which requires the court to consider such resources, verbatim.

In light of John's failure to seek a more specific finding from the court, and in light of the fact that a finding of disparity in the parties' financial resources due to the parties' respective incomes was supported by the evidence, we conclude that the court did not abuse its discretion in awarding Vicki 25% of her attorney fees and expert witness fees.

John also argues that KRS 403.220 allows an award for a "reasonable" fee and that the court did not conduct an analysis of the eight factors to be considered in this regard. *See Boden v. Boden,* 268 S.W.2d 632, 633 (Ky.1954). John further notes that the court stated at one point in its order that "[t]he attorney fees in this case border on outrageous." However, the court stated in other portions of its orders that the award to Vicki of 25% of her attorney fees and expert witness fees was reasonable. John also admitted that he had paid a considerable portion of his own attorney fees and expert witness fees from marital funds. Given the circumstances surrounding the award to Vicki, we conclude that the court did not abuse its discretion.

The decree and orders of the Fayette Circuit Court, Family Branch, are therefore affirmed in part and vacated in part and remanded.

ALL CONCUR.