RENDERED:  APRIL 12, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0855-MR

JASWINDER SINGH   APPELLANT

APPEAL FROM DAVIESS CIRCUIT COURT
v.   HONORABLE JOSEPH W. CASTLEN, III, SPECIAL JUDGE
ACTION NO. 18-CI-00379

HARVINDER KAUR   APPELLEE

AND

NO. 2022-CA-0990-MR

HARVINDER KAUR   CROSS-APPELLANT

CROSS-APPEAL FROM DAVIESS CIRCUIT COURT
v.   HONORABLE JOSEPH W. CASTLEN, III, SPECIAL JUDGE
ACTION NO. 18-CI-00379

JASWINDER SINGH   CROSS-APPELLEE

\*\* \*\* \*\* \*\* \*\*

BEFORE:  CALDWELL, GOODWINE, AND LAMBERT, JUDGES.

LAMBERT, JUDGE:  Jaswinder Singh appeals from the findings of fact, conclusions of law, and decree of dissolution entered by the Daviess Family Court. His former wife, Harvinder Kaur, cross-appeals from same.  After careful review of the extensive record before us, the briefs, and applicable law, we affirm.

**Factual and Procedural Background**

The parties were born in India.  Jaswinder immigrated to the United States in 1996, and lived in the New York/New Jersey area with his two brothers, Satnam and Kulwant.  Jaswinder married shortly after arriving in the United States, but the marriage lasted only a few months.  He married again and the couple moved to Owensboro, Kentucky, in 2003, along with Satnam and Kulwant. Jaswinder and his second wife purchased a new home, and Kulwant and his wife moved in.  The brothers owned and operated numerous businesses in the Owensboro area, which will be discussed in depth later in this Opinion.  Satnam was deported in 2007, but later legally immigrated to Canada, where he still resides.

Jaswinder's second wife died in 2013.  Shortly thereafter, he created a profile on an Indian dating website.  He first communicated with Harvinder's

brother, who gave Jaswinder permission to begin communicating with Harvinder. Jaswinder made a trip to India in December 2013, where he met Harvinder for the first time. Jaswinder described to Harvinder and her family the various gas stations and convenience stores he owns and operates in the United States, and showed them photographs of same. During the same trip, Jaswinder and Harvinder became engaged.

Although Jaswinder returned to the United States after their engagement, the couple kept in communication and Jaswinder made return trips to India. On February 15, 2015, the couple married in India. However, Harvinder was unable to obtain a visa for entry into the United States, so she remained in India. Jaswinder agreed to sponsor and support Harvinder and signed a document with the Department of Homeland Security agreeing to fully support her for 10 years or until she became a United States citizen or obtained full-time employment. With Jaswinder as her husband and sponsor, Harvinder was able to move to the United States in June 2016.

Shortly after Harvinder's arrival, Kulwant and his wife moved to the Seattle, Washington, area to be closer to Satnam, in Canada. Even though Satnam and Kulwant were no longer in the Owensboro area, they continued to own and operate various businesses which were left in the hands of Jaswinder. Harvinder took care of Jaswinder's two children from his previous marriage and was a

homemaker. Jaswinder worked long hours at the various gas stations and convenience stores.

The parties' marriage began to sour in late 2017. In March 2018, Jaswinder met with an attorney who drew up what was essentially a post-nuptial agreement in which Harvinder agreed she would relinquish all interest in any business or property owned by Jaswinder, any maintenance, and any right of inheritance from Jaswinder. She refused to sign the agreement. In April 2018, Jaswinder forced Harvinder to leave the marital home with no clothes, money, or possessions.[1] Her cellular telephone service was cancelled within minutes. A friend took Harvinder into her home, where she has since remained. Jaswinder filed for divorce shortly thereafter.

The proceedings before the family court were extensive and contentious. Jaswinder presented himself as impoverished and with few assets. Harvinder focused on her efforts to unravel Jaswinder's numerous business dealings and entanglements with his brothers, as well as their many complicated financial transactions, in an attempt to prove that Jaswinder owned considerably more assets than he let on to the family court. After the conclusion of approximately twenty-three hearings, countless hours of which were devoted

---

[1] Jaswinder also obtained an emergency protective order (EPO) against Harvinder on the day she was forced to leave the marital home. This was the second of two EPOs Jaswinder obtained; however, both were dismissed and no domestic violence order was entered at any time.

solely to the issue of temporary maintenance, entry of a final order was delayed until appointment of a special judge, who then had to review the extensive record. A final order and decree were entered on April 19, 2022. Jaswinder filed a motion for additional findings and to vacate certain portions of the decree. The family court granted Jaswinder's motion in part, and entered amended findings of fact, conclusions of law, and a decree of dissolution on July 1, 2022. The family court made thirty-three pages of findings in its amended order. It awarded Harvinder $230,000.00 as her share of a Valero gas station purchased by Jaswinder from his brother Kulwant during the marriage; ordered Jaswinder to pay her medical bills acquired during the marriage and before Harvinder became a United States citizen; and ordered Jaswinder to pay Harvinder's attorney's fees in the amount of $44,167.50. Harvinder was not awarded permanent maintenance, nor any portion of the equity in the marital home. Both parties appealed. Further facts will be developed as necessary.

### Standard of Review

Both parties appeal from the division of marital assets and debt.

Questions of whether property or debt is marital or nonmarital are left to the sound discretion of the trial court, as is the equitable division of any marital property, and will be reviewed for abuse of discretion, namely, whether the decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles.

*Rice v. Rice*, 336 S.W.3d 66, 68 (Ky. 2011) (internal quotation marks and citations omitted).

However, the case at bar is unique in that Jaswinder not only argues the Valero gas station is not *marital* property, but that it in fact does not now and has never at any time belonged to him; rather, it has always belonged solely to his brother, Kulwant. We will set aside the family court's findings only if they are clearly erroneous (*i.e.*, not supported by substantial evidence). *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003) (footnote omitted). "[S]ubstantial evidence is [e]vidence that a reasonable mind would accept as adequate to support a conclusion and evidence that, when taken alone or in the light of all the evidence, . . . has sufficient probative value to induce conviction in the minds of reasonable men." *Id.* (internal quotation marks and footnotes omitted).

Finally, Jaswinder's appeal of the award of attorney's fees is reviewed for an abuse of discretion. *Allison v. Allison*, 246 S.W.3d 898, 909 (Ky. App. 2008) (citation omitted).

**Analysis**

We begin by quoting the family court:

Jaswinder and his brothers have operated numerous businesses involving millions of dollars of transactions and more than likely have taken unreported cash out of operations in large sums over many years. It is most difficult to attempt to untangle the web they have sewn. There are no financial written records except basic tax

> returns which are destroyed [after three years] and prepared [only] on the basis of verbal information provided to their accountant.

We cannot overemphasize these points enough as we begin our analysis. Jaswinder has, by design with his brothers, woven a tangled web of business and financial transactions as to avoid scrutiny by any person or entity, including the family court, this Court, and taxing authorities. This has been accomplished, in part, through the creation of countless corporations with the Kentucky Secretary of State. Some of these corporations own real estate and businesses associated with the real estate, but some of the businesses operate on real estate that is leased. Others are businesses opened for the sole purpose of running another business; others do not appear from the record before us to operate any business at all. Some are owned by Jaswinder alone, others only by his brothers, and some are owned with his brothers.

Jaswinder and his brothers routinely buy and sell businesses amongst themselves and with other non-family members, but there are no paper trails whatsoever of these transactions. They do not keep financial records or receipts, including for the businesses that are operating gas stations and convenience stores. Their accountant prepares tax returns based solely on Jaswinder's oral representations and bank statements. Those tax returns are promptly destroyed after three years. The tax returns that were obtained by Harvinder show the gas

station/convenience store businesses have millions of dollars in gross receipts, yet Jaswinder insists he is impoverished and barely getting by.

The family court found the testimony of Jaswinder and his brothers to be completely without credibility, in part, because it did not reflect the reality of Jaswinder's lifestyle. "[D]ue regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses because judging the credibility of witnesses and weighing evidence are tasks within the exclusive province of the trial court." *Moore*, 110 S.W.3d at 354 (internal quotation marks and footnotes omitted). Although the family court made extensive findings related to each of the businesses and significant financial transactions, we decline to reiterate those findings herein. Instead, we highlight only a few to demonstrate the family court did not abuse its discretion and that its findings were supported by substantial evidence.

We now turn to Jaswinder's first argument. He claims he does not own the Valero gas station at issue; therefore, it is not marital property subject to division by the family court and, even it is, the family court failed to value the asset by any proof other than the testimony of Harvinder. We disagree.

Kulwant purchased the Valero gas station in 2013 for $40,000.00. Desiring to renovate and make it an operable gas station and convenience store, both Kulwant and Jaswinder applied for a loan for $77,100.00 in July 2014. An

affidavit from the loan agent contained in the record before us shows that Jaswinder stated he was a partner in the following corporations: GNDJ, Inc., Jai Shreehardi, Inc., JASN, LLC, JMND, Inc., and SBN, Inc. However, at the time, only GNDJ, Inc. was still in existence and operated a gas station and convenience store at 30 Bon Harbor Hills Road. The affidavit also states that Jaswinder listed his total assets as $595,000.00, with $50,000.00 of that being cash, and his total liabilities as $100,000.00. Jaswinder put his home up as collateral for the loan, which was ultimately approved. Shortly thereafter, Kulwant opened a corporation called Mr. Rattan, Inc. Only Kulwant's name was contained in the articles of incorporation. He also opened a bank account under the name of Mr. Rattan, Inc. Although Jaswinder's name is not listed in the articles of incorporation, his name was listed as an owner of the bank account.

In 2015, another loan was obtained for the Valero gas station in the amount of $154,801.00. Although the loan was in Kulwant's name, Jaswinder provided a commercial guaranty. The proceeds from the loan were deposited into the Mr. Rattan, Inc. bank account. Jaswinder wrote and signed all checks, for all business purposes, from the Mr. Rattan, Inc. bank account from 2016 until 2019. After being questioned about ownership of the account during his deposition in 2019, Jaswinder asked Kulwant to remove his name from the bank account. Now

Jaswinder still writes all the checks, but signs them using a rubber stamp with Kulwant's signature.

In September 2016, Kulwant and his wife moved to the Seattle, Washington area. Harvinder testified that days before the move, she, Jaswinder, Kulwant, and his wife had a meeting at the home of Jaswinder and Harvinder. She stated they discussed the Valero gas station and that it was worth $1.3 million, and Jaswinder and Kulwant each owned an equal share valued at $650,000.00. It was decided that Jaswinder would purchase Kulwant's share. Jaswinder then retrieved $128,000.00 in cash from his safe in the home and gave it to Kulwant. Another $190,000.00 was to come from Satnam as reimbursement for money owed to Jaswinder. Afterward, Jaswinder continued to send money to Kulwant for the purpose of purchasing the business. Harvinder testified to one instance she knew about when he sent an additional $25,000.00 and another when he sent $75,000.00. She testified that, as a result, Jaswinder became owner of the Valero gas station/Mr. Rattan, Inc.

Jaswinder emphatically denies the meeting with Kulwant ever occurred and denies the existence of a safe containing cash in his home. He does acknowledge that, in October 2017, he formed the corporation Rattan Properties, Inc. with the goal of purchasing the Valero gas station/Mr. Rattan, Inc. from Kulwant. Although he had always used his home address to form corporations in

the past, he used the address of his accountant to form Rattan Properties, Inc. As a result, all paperwork concerning this business was mailed to the accountant and not the marital home. Jaswinder testified in his deposition that he sent Kulwant $2,000.00 per month for the first three or four months of 2018 towards the purchase of the Valero gas station/Mr. Rattan, Inc. before he decided not to purchase it after all. Strangely, Jaswinder testified that he took the money from the Mr. Rattan, Inc. bank account, deposited it into the Rattan Properties, Inc. bank account, and then sent the money to Kulwant by check. In other words, if we are to believe Jaswinder's version of events, then Jaswinder was taking Kulwant's money, putting it in Jaswinder's account, then using the same money towards Jaswinder's purchase of Kulwant's business. This is simply nonsensical. Further, Kulwant never returned any of the money to Jaswinder after Jaswinder decided not to purchase the Valero gas station/Mr. Rattan, Inc.

Even though "on paper" Kulwant still owns Mr. Rattan, Inc., the Valero gas station, and the associated bank account, he does not, and has never, received any income from the business. Jaswinder is in charge of every aspect of its operation on a daily basis. This convoluted manner of doing business is consistent with how Jaswinder and his brothers operate their various companies and engage in dealings with one another. For example, Satnam testified that he

took out a loan on a piece of real property he owns in Owensboro.[2]  This property was formerly a nightclub called the Yellow Rose, but was abandoned before Satnam purchased it.[3]  Jaswinder signed documents for Satnam as his power of attorney to obtain a loan for $140,000.00 using the Yellow Rose as collateral.  The brothers testified the money was actually intended for Kulwant to purchase a home near Seattle and Satnam did give the loan proceeds to Kulwant.  However, when Kulwant received the money, he sent it to Satnam.  When asked why he did not keep the money to purchase a home as intended, Kulwant's response was that it was his money and he could do whatever he wanted with it.  Again, the shuffling around of large sums of money between the brothers in this manner defies logic.

The evidence and record before us show that Jaswinder is paid $200.00 per week from the Mr. Rattan, Inc. bank account for operating the Valero gas station.  His personal tax returns reflect this meager salary.  Jaswinder is also compensated in other ways from Mr. Rattan, Inc. for his operation of the Valero gas station.  His first and second mortgages are paid through Mr. Rattan, Inc., as

---

[2] The family court made detailed findings about the nature of Satnam's purchase of the Yellow Rose as further illustration of how the brothers do business which lent itself to the family court's determination that they were not credible witnesses.  Satnam testified he did not need a loan to purchase the property for $210,000.00, but rather used his own funds that various friends and family members were "holding" for him.

[3] The Yellow Rose is still not a functioning business.  There was one potential tenant, but the lease was never finalized.  The family court had suspicions that Jaswinder also owns an interest in the Yellow Rose because he is the point of contact for all matters, but in the end could not confirm its suspicion via substantial evidence.

well as his cellular telephone bill and automobile gasoline. Jaswinder does not claim this compensation on his personal tax returns. He also receives Social Security benefits each month for his children due to the death of their mother. Because his salary is so low, Jaswinder is entitled to numerous tax credits and often receives thousands of dollars in refunds each year. However, rather than take the tax refunds each year for the shortfalls he claims to have for living expenses, he applies the amount towards taxes for the following year. Jaswinder's low salary also means both he and his children receive Medicaid health insurance benefits.[4]

The family court did not find credible Jaswinder's testimony that his only income is $200.00 per week. It questioned why Jaswinder would continue to operate these businesses for years on end for such meager compensation.[5] We agree with the family court's determination. Jaswinder was able to obtain a loan with his brother, Kulwant, based on financial representations made to the bank that do not reflect the impoverished life Jaswinder tries to present. Both Jaswinder and Harvinder testified about numerous trips to India during the marriage for one or

---

[4] Even though he married Harvinder in 2015, Jaswinder filed taxes that year as a widower claiming two children. When pressed about the issue, both Jaswinder and his accountant testified he could not file as married because Harvinder was still in India in 2015 and did not have a Social Security number. No one questioned the accountant about whether Jaswinder could have obtained an Individual Tax Identification Number (ITIN) for Harvinder in place of a Social Security number so that he could have filed his taxes as married in 2015.

[5] At a hearing on February 25, 2019, counsel argued that Jaswinder works 40 to 60 hours per week at the Valero gas station. If true, he is being paid anywhere from $3.33 per hour to $5.00 per hour, considerably below the federal minimum wage of $7.25 per hour.

both of them, and also at least one trip to Canada with the children. Both parties also testified that Jaswinder sent approximately $25,000.00 to Harvinder's family in India during the short marriage. Also damaging to Jaswinder's credibility about his financial situation is the fact that he sold another business, JMND, Inc. during the marriage. Although Jaswinder estimated he received approximately $26,000.00 for the sale in 2016, there is no paperwork for the transaction, and it does not appear on any tax return or as a deposit to any bank account. Even if Jaswinder received only $26,000.00 for the sale, the proceeds were income in addition to his $200.00 per week earnings that went wholly unrecorded and unreported. The family court found that Jaswinder "wants for nothing" and lives a very comfortable life for a person supposedly earning just $200.00 per week. Stated differently, the numbers simply do not add up in terms of Jaswinder's stated income versus his lifestyle.

Finally, there is another gas station/convenience store that, for the sake of simplicity, will be referred to as Bon Harbor.[6] Bon Harbor is operated by a company called GNDJ, Inc. GNDJ, Inc. does not own the real estate associated with the gas station, which is leased from a third party.[7] Narinder Kumar is a

---

[6] "Bon Harbor" is another Valero gas station located at 30 Bon Harbor Hill Drive in Owensboro, Kentucky.

[7] The lease agreement was signed by Jaswinder.

friend and business associate of Jaswinder, Satnam, and Kulwant who testified on January 21, 2021. Initially, Narinder testified that he owned GNDJ, Inc. with Satnam, but purchased Satnam's share in early 2016.[8] However, his testimony changed shortly thereafter, and he stated that Satnam never owned a share of GNDJ, Inc. and that he in fact purchased Jaswinder's share of the company in early 2016 for $150,000.00.[9] Jaswinder denied ownership of GNDJ, Inc. Rather, he stated his name was added only so that he could run the company, which was owned by Satnam and Narinder, until Narinder purchased Satnam's share. However, 2015 tax returns indicate Jaswinder owned 100% of GNDJ, Inc.

The distribution of funds received from Narinder for the purchase of GNDJ, Inc. is another source of confusion. Narinder initially wrote a check to Jaswinder for $50,000.00, but Jaswinder testified that, because this was really Satnam's money and Satnam wanted the money to go to Kulwant for reasons that are unexplained, Jaswinder signed the check then gave it to Kulwant, who then sent the check to Satnam. Then, some months later, Kulwant sent Satnam the other $100,000.00 owed from Narinder. Again, this convoluted method of exchanging large sums of money is nonsensical.

---

[8] *See* page 14 of hearing transcript from January 21, 2021.

[9] *See* pages 15 and 19 of hearing transcript from January 21, 2021.

Moreover, although Jaswinder claims GNDJ, Inc. really belonged to Satnam, Satnam's name never appeared on any paperwork or bank account associated with the business and he never received compensation from the business with the exception of possibly proceeds from its sale. Satnam testified he never reported the proceeds of the sale of GNDJ, Inc. on any tax return. Although the family court determined that it could not conclude from the evidence how much of GNDJ, Inc. was owned by Jaswinder during the marriage, the extremely confusing – and sometimes conflicting – testimony of Jaswinder, his brothers, and Narinder Kumar further damaged their credibility.

The family court found Harvinder's testimony regarding the Valero gas station/Mr. Rattan, Inc. credible. It believed that Jaswinder initially owned 50% of the business and made a finding that Jaswinder purchased the other 50% from Kulwant for $650,000.00 in 2016. However, $190,000.00 of that amount was some sort of credit owed to Jaswinder from either Satnam, Kulwant, or both. Because the family court could not determine if this credit arose during or prior to the marriage, it deducted the amount. Therefore, the family court found the marital interest of the Valero gas station to be $460,000.00 (or $650,000.00 minus $190,000.00).[10]

_____

[10] Jaswinder points out that the original judge in this action made a finding that the Mr. Rattan, Inc./Valero gas station was owned by Kulwant, not Jaswinder, in an order entered on December

Jaswinder argues the Valero gas station and the associated business of Mr. Rattan, Inc. is not marital property because it does not now and has never belonged to him. The family court found otherwise. "Substantial evidence is evidence, **when taken alone or in light of all the evidence**, which has sufficient probative value to induce conviction in the mind of a reasonable person." *Hunter v. Hunter*, 127 S.W.3d 656, 659 (Ky. App. 2003) (emphasis added) (citations omitted). In light of all the evidence demonstrating how Jaswinder and his brothers conduct business and pass large sums of money amongst themselves, we decline to disturb the family court's finding that Jaswinder owns the Valero gas station and the associated Mr. Rattan, Inc. as a result of a transaction that occurred in September 2016.

Jaswinder also argues that, even if the business is marital property, the family court failed to assign a value to it based on anything other than Harvinder's testimony. We note that, although Harvinder never filed a formal motion to appoint a forensic accountant or conduct a business appraisal, the possibility was discussed at several hearings that appear in the record before us. Each time the issue came up, Jaswinder voiced a strong objection and stated that he would refuse

20, 2019. However, this order was in regard to *temporary maintenance* and the family court continued to hear evidence over the next three years until a final order was entered.

-17-

to pay for or participate in any such undertaking.[11]  The issue was never pressed by the family court and the only evidence of the value of the company is Harvinder's testimony regarding a conversation and financial transaction for which she was present.  That is enough.  The family court's findings are supported by substantial evidence.

Jaswinder then argues that, even if he does own an interest in the Valero gas station/Mr. Rattan, Inc., the family court failed to consider Kentucky Revised Statute (KRS) 403.190(1)(a)-(d), which provides

> (1) In a proceeding for dissolution of the marriage or for legal separation, or in a proceeding for disposition of property following dissolution of the marriage by a court which lacked personal jurisdiction over the absent spouse or lacked jurisdiction to dispose of the property, the court shall assign each spouse's property to him. It also shall divide the marital property without regard to marital misconduct in just proportions considering all relevant factors including:
>
>> (a) Contribution of each spouse to acquisition of the marital property, including contribution of a spouse as homemaker;
>>
>> (b) Value of the property set apart to each spouse;
>>
>> (c) Duration of the marriage; and
>>
>> (d) Economic circumstances of each spouse when the division of property is to become

---

[11] *See* hearings that occurred on May 19, 2019, and September 9, 2019.

> effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to the spouse having custody of any children.

Jaswinder's argument is refuted by the record. The family court considered and made findings related to each of the factors present in KRS 403.190(1)(a)-(d). With regard to the first factor, despite Jaswinder's argument that Harvinder contributed absolutely nothing to the marriage, the family court found that, although Jaswinder developed most of the businesses prior to marrying Harvinder, she contributed as a homemaker by caring for his two children, maintaining the home, and occasionally working as a clerk in the convenience store. The family court also considered the value of the property awarded to each party, including the home and various businesses awarded to Jaswinder. Regarding the third and fourth factors, the family court acknowledged the brief duration of the marriage. It also found that, despite what Jaswinder reports as his income to the IRS, it is significantly greater. Harvinder, on the other hand, is in poor health, unable to work long hours, and reliant on her friend for many necessities.

The family court also considered other aspects of Harvinder's situation. Jaswinder has lived in the United States since 1996 and Harvinder has been here only since 2016. She was enticed to marry Jaswinder, in part, through statements made and photographs shown to her family regarding successful

businesses owned by Jaswinder. Unlike Jaswinder, Harvinder has no family here. Her English skills were poor, but are improving. Jaswinder did not allow her to drive a vehicle and restricted her to primarily staying in the home. The family court did not abuse its discretion in its distribution of marital property.

Before we proceed to Jaswinder's remaining arguments, we address the only argument made by Harvinder on her cross-appeal, which is that she should have received half of the equity in the home, which was awarded entirely to Jaswinder. It is undisputed that Jaswinder owned the home prior to his marriage to Harvinder. The parties also agree that the home is worth approximately $211,000.00 and is encumbered by a first and second mortgage which together total approximately $81,400.00. Harvinder argues she is entitled to half of the equity of the home and that she should not be penalized for the home being used as collateral for the loan for the Valero gas station. She lived in the home for a very short time due to the short duration of the marriage and, furthermore, the family court emphasized that the bulk of property awarded to Harvinder was coming from the purchase of the Valero gas station/Mr. Rattan, Inc. business during the marriage. After careful review and consideration of the factors provided in KRS 403.190(1)(a)-(d) as discussed *infra*, we cannot say the family court abused its discretion by not providing Harvinder half of the equity of the marital home.

Jaswinder also argues the family court abused its discretion by ordering him to pay medical debt acquired by Harvinder during the marriage. We disagree. It is undisputed that, prior to Harvinder's arrival in the United States, in 2015 or 2016, Jaswinder signed a document with the Department of Homeland Security as Harvinder's sponsor, promising to support her financially at least 125% above the federal poverty level for 10 years or until she became a United States citizen or worked full-time. The medical bills incurred by Harvinder occurred in 2017 and 2018. She did not become a U.S. citizen until November 2019, and she has never worked full-time. Moreover, Harvinder did not have Medicaid benefits when the medical bills were incurred. It was not an abuse of discretion for the family court to assign Harvinder's medical debt to Jaswinder.

Finally, Jaswinder argues the family court abused its discretion by ordering him to pay Harvinder's attorney fees. KRS 403.220 provides that

> [t]he court from time to time after considering the
> financial resources of both parties may order a party to
> pay a reasonable amount for the cost to the other party of
> maintaining or defending any proceeding under this
> chapter and for attorney's fees, including sums for legal
> services rendered and costs incurred prior to the
> commencement of the proceeding or after entry of
> judgment. The court may order that the amount be paid
> directly to the attorney, who may enforce the order in his
> name.

Although the statute requires the family court to *consider* the financial resources of the parties when deciding whether to award attorney's fees, it is not

required to make specific findings in that regard. *See, e.g.*, *Miller v. McGinty*, 234 S.W.3d 371, 374 (Ky. App. 2007). It is obvious from the findings of fact entered by the family court that the disparate financial resources of the parties were extensively considered. Interestingly, Jaswinder argues the family court did not consider that he paid Harvinder over $39,000.00 in temporary maintenance during the pendency of this action. Jaswinder presents himself as impoverished and in dire financial straits when it suits him (*e.g.*, to the IRS, to Medicaid authorities, to the family court in order to prevent an award of any property or finances to Harvinder); but on the other hand, emphasizes his assets when it suits him (*e.g.*, to acquire a loan or to show Harvinder and her family his successful businesses in the United States). He also points out how much money he has provided to Harvinder (*e.g.*, by way of temporary maintenance; as well as how much money he sent to her family in India during the marriage) when it suits him. This selective presentation of facts further damaged Jaswinder's credibility to the family court.

The contrast in financial resources of the parties is stark, to say the very least, and the family court found accordingly. Harvinder's counsel submitted a detailed accounting of her hours over the very long duration of this case. The family court considered it and awarded attorney's fees to Harvinder. The family court did not abuse its discretion.

## Conclusion

For the reasons stated herein, the findings of fact, conclusions of law, and decree of dissolution of the Daviess Family Court is affirmed.

ALL CONCUR.

| | |
|---|---|
| BRIEFS FOR APPELLANT/CROSS-APPELLEE JASWINDER SINGH: | BRIEF FOR APPELLEE/CROSS-APPELLANT HARVINDER KAUR: |
| David L. Yewell<br>Owensboro, Kentucky | Cheryl Cureton Spalding<br>Owensboro, Kentucky |