# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-17-00508-CR

**Ashton Blake Salvato, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BELL COUNTY, 264TH JUDICIAL DISTRICT
### NO. 76778, THE HONORABLE MARTHA J. TRUDO, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Ashton Blake Salvato of the offense of manslaughter, *see* Tex. Penal Code § 19.04, for fatally shooting his three-year-old daughter, and assessed his punishment at confinement for 20 years in the Texas Department of Criminal Justice and a $10,000 fine, *see id.* § 12.33. On appeal, appellant challenges the sufficiency of the evidence. We affirm the trial court's judgment of conviction.

## BACKGROUND

The jury heard evidence that appellant lived with Dustin Rhodes and Brittany Brown in a house in Killeen, Texas. Appellant, who had recently been medically discharged from the Army, kept firearms in the home, in the closet in his room: a pistol, a shotgun, and an AR-15 rifle, which were always loaded. He was in the process of divorcing his wife, the mother of his three-year-old daughter, C.J.S., and a court order regarding custody and visitation of their daughter was in place.

On the weekend of April 17, 2015, appellant had three-year-old C.J.S. at his home for his weekend visitation. On Saturday morning, Brown and Rhodes were in the living room, sitting on the couch watching TV. Appellant was also in the room. C.J.S. was awake and had been in the living room, but appellant had sent her to his room for a "time out" because she had been crying and was "whiney." For time out, C.J.S. was required to stand in the corner behind the door of appellant's room.

At one point that morning, Brown, who was not feeling well, said something to the effect of "Just shoot me, I feel horrible." She expressed this sentiment aloud to no one in particular. Appellant, who was standing at the edge of the couch, left the room and returned with his AR-15 rifle, which had a loaded magazine in it. He pointed the weapon at Brown's head as she sat on the couch. Brown told appellant that "it wasn't funny" and pulled a blanket over her head to hide. Appellant then pulled back the charging handle on the rifle, pushed off the safety mechanism, pulled the trigger, and "dry fired" the weapon at her. Brown told appellant again that "it wasn't funny."

Appellant left the living room, heading toward his room. Less than two minutes later, Brown and Rhodes heard the "pop" of a gunshot coming from the direction of appellant's room. They then heard appellant screaming. He came into the living room carrying C.J.S., who had been shot in the head. Appellant put C.J.S. down on the kitchen floor, stayed with her for less than a minute, and then began pacing in the living room, crying and saying that C.J.S. was dead. Brown went to her room, into one of the closets in her bathroom, and called 911. Brown and Rhodes both spoke with the 911 operator and, during their conversation, indicated that the shooting was an accident. While they were talking to the 911 operator, appellant retrieved his pistol from his

2

bedroom, pointed it at his head as he paced, and said he was going to shoot himself. Rhodes convinced him to put the weapon down.

First responders, which included officers from the Killeen Police Department and paramedics from the Killeen Fire Department, arrived on the scene within ten minutes of the 911 call. Although resuscitation efforts were made, testimony from these responders indicated that immediately upon viewing C.J.S., it was "obvious" to them that her injury was "incompatible with life." The three-year-old was transported to the hospital where she was pronounced dead.

At the scene, appellant told the police that he was "just messing around with the rifle and it went off." He then explained that the rifle discharged as he was "clearing" the weapon. In his written statement to police later that day, appellant described the "joke" he played on Brown. He said that "after the joke was done," he pulled the charging handle back half way, "glanced in the chamber," and pulled the trigger. He stated that "a round went off and hit [his] daughter." In his statement, appellant denied intentionally shooting C.J.S. or aiming the rifle at her.

Appellant was arrested for manslaughter but was subsequently indicted for capital murder of a child under the age of ten. *See* Tex. Penal Code § 19.03(a)(8). At trial, the State presented the testimony of 14 witnesses: C.J.S.'s mother, who provided general information about her daughter and appellant's visitation with C.J.S.; appellant's two housemates, Brown and Rhodes, who gave their account of the events that morning; the custodian of records for the county 911 center, who provided a recording of the 911 call; two paramedics from the fire department, who described what they observed about C.J.S.'s condition when they arrived on the scene; the first responding police officer, who testified about finding C.J.S. and his subsequent conversation with

3

appellant at the crime scene; four police detectives, including two detectives from the special victims unit, who testified about their roles in the investigation; a firearms expert, who testified about the functionality of appellant's AR-15 and the casing recovered from the hallway; the medical examiner, who testified about the autopsy of C.J.S. and his findings concerning her injuries and cause of death; and a crime scene reconstruction expert, who provided testimony about his reconstruction of the shooting incident. The defense presented no witnesses but presented appellant's defense—that he shot his daughter when "clearing" his rifle—through the State's evidence.

At the conclusion of the guilt-innocence phase, in the court's jury charge, the trial court instructed the jury on the charged capital-murder offense. However, the court also, sua sponte, submitted an instruction on the lesser-included offense of manslaughter. The jury found appellant guilty of manslaughter. After hearing further evidence during the punishment phase—including testimony about prior instances when C.J.S. had bruises on her face because appellant purportedly struck her in the face—the jury assessed the maximum punishment for appellant: a 20-year prison sentence and a $10,000 fine.

**DISCUSSION**

In a single point of error, appellant challenges the sufficiency of the evidence supporting his conviction. He maintains that the evidence at trial failed to prove, beyond a reasonable doubt, that he had the requisite mental state when he fatally shot his daughter.

Due process requires that the State prove, beyond a reasonable doubt, every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 313 (1979); *Lang v. State*, 561 S.W.3d 174, 179 (Tex. Crim. App. 2018); *Rabb v. State,* 434 S.W.3d 613, 616 (Tex. Crim. App. 2014). When

4

reviewing the sufficiency of the evidence to support a conviction, we consider all the evidence in the light most favorable to the verdict to determine whether, based on that evidence and the reasonable inferences therefrom, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013); *see Musacchio v. United States*, — U.S. —, 136 S. Ct. 709 (2016); *Johnson v. State*, 560 S.W.3d 224, 226 (Tex. Crim. App. 2018). In our sufficiency review we consider all the evidence in the record, whether direct or circumstantial, properly or improperly admitted, or submitted by the prosecution or the defense. *Thompson v. State*, 408 S.W.3d 614, 627 (Tex. App.—Austin 2013, no pet.); *see Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We assume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Jackson*, 443 U.S. at 318; *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). We consider only whether the factfinder reached a rational decision. *Arroyo v. State*, 559 S.W.3d 484, 487 (Tex. Crim. App. 2018); *see Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016) (observing that reviewing court's role on appeal "is restricted to guarding against the rare occurrence when a fact finder does not act rationally" (quoting *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010))). "The key question is whether 'the evidence presented actually supports a conclusion that the defendant committed the crime that was charged.'" *Morgan*, 501 S.W.3d at 89 (quoting *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007)).

The trier of fact is the sole judge of the weight and credibility of the evidence. *See Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018); *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014); *see also* Tex. Code Crim. Proc. art 36.13 (explaining that "the jury is the exclusive judge of the facts"). Thus, when performing an evidentiary-sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Arroyo*, 559 S.W.3d at 487; *see Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). Instead, we must defer to the credibility and weight determinations of the factfinder. *Cary v. State*, 507 S.W.3d 750, 757 (Tex. Crim. App. 2016); *Nowlin v. State*, 473 S.W.3d 312, 317 (Tex. Crim. App. 2015). When the record supports conflicting reasonable inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that resolution. *Zuniga*, 551 S.W.3d at 733; *Cary*, 507 S.W.3d at 757; *Blea*, 483 S.W.3d at 33; *see Musacchio*, 136 S. Ct. at 715 (reaffirming that appellate sufficiency review "does not intrude on the jury's role 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts'" (quoting *Jackson*, 443 U.S. at 319)). We must "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015) (quoting *Clayton*, 235 S.W.3d at 778); *accord Arroyo*, 559 S.W.3d at 487.

Because factfinders are permitted to make reasonable inferences, "[i]t is not necessary that the evidence directly proves the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing the guilt of the actor, and circumstantial evidence alone can be

6

sufficient to establish guilt." *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)); *accord Tate v. State*, 500 S.W.3d 410, 413 (Tex. Crim. App. 2016); *Nowlin*, 473 S.W.3d at 317. The standard of review is the same for direct and circumstantial evidence cases. *Jenkins*, 493 S.W.3d at 599; *Nowlin*, 473 S.W.3d at 317; *Dobbs*, 434 S.W.3d at 170.

A person commits the offense of manslaughter "if he recklessly causes the death of an individual." Tex. Penal Code § 19.04(a). Manslaughter is a result-oriented offense; thus, the defendant's culpable mental state must relate to the result of his conduct—that is, the causing of the death. *Schroeder v. State*, 123 S.W.3d 398, 399–401 (Tex. Crim. App. 2003). "A person acts recklessly, or is reckless, . . . when he is aware of but consciously disregards a substantial and unjustifiable risk that . . . the result will occur." Tex. Penal Code § 6.03(c). The risk created "must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." *Id.*

"Recklessness requires the defendant to actually foresee the risk involved and to consciously decide to ignore it." *Williams*, 235 S.W.3d at 751; *see* Tex. Penal Code § 6.03(c). Whether the actor is aware of the requisite risk is a conclusion to be reached by the trier of fact from all the evidence and the inferences drawn therefrom. *Miller v. State*, No. 03-07-00527-CR, 2010 WL 140390, at *5 (Tex. App.—Austin Jan. 13, 2010, pet. ref'd) (mem. op., not designated for publication); *In re E.U.M.*, 108 S.W.3d 368, 370 (Tex. App.—Beaumont 2003, no pet.); *see Dillon v. State*, 574 S.W.2d 92, 94 (Tex. Crim. App. 1978) (observing that proof of culpable mental state

7

generally relies on circumstantial evidence and "whether one is aware of a requisite risk . . . is a conclusion to be drawn through inference from all the circumstances by the trier of fact"). "The issue is not one of theoretical possibility, but one of whether, given all the circumstances, it is reasonable to infer that the particular individual on trial was in fact aware of the risk." *Dillon*, 574 S.W.2d at 95. A defendant, however, need not be aware of the specific risk of another's death in order to commit manslaughter. *Miller*, 2010 WL 140390, at *5; *Trepanier v. State*, 940 S.W.2d 827, 829 (Tex. App.—Austin 1997, pet. ref'd).

It is undisputed that appellant caused C.J.S.'s death by shooting her in the face with his AR-15. Therefore, in light of the foregoing, we must examine the record for evidence that appellant recklessly caused her death. Accordingly, we review the record for evidence that appellant was subjectively aware of a substantial and unjustifiable risk that C.J.S. would die when he pulled the trigger on his AR-15 rifle. *See* Tex. Penal Code § 6.03(c); *Williams*, 235 S.W.3d at 752–53.

The firearms expert established that appellant's weapon was fully functional. She opined that just "clearing" the weapon would not cause it to discharge; the trigger had to be pulled for the rifle to fire. The firearms expert also testified that if the rifle had a loaded magazine—and the evidence reflects that appellant's rifle had a loaded magazine in it that morning—in order to load a round into the chamber, someone would need to pull the charging handle back just over three inches. Although appellant first told police that he shot his daughter when the rifle discharged as he was "clearing" it, in his written statement, appellant admitted that he pulled the trigger after he pulled the charging handle back "half way." He maintained, though, that he did not aim the rifle at

8

C.J.S. The evidence at trial, however, contradicted his claim to police that he did not point the rifle at or toward his daughter.

First, the autopsy conducted on C.J.S. revealed that she died of a single gunshot wound to the head. The entrance wound was on the left side of her face where the left eye and bridge of her nose met; the "pretty large exit wound" was on the left back side of her head. The medical examiner testified that there was gunpowder stippling on the lower portion of the entrance wound. He explained that these powder marks on her skin indicated that the barrel tip was close enough to the skin surface when the weapon discharged that some of the gunpowder reached the skin surface and struck her face. The medical examiner opined that the barrel tip was "very close . . . within a few inches."

Second, as part of the investigation, a certified crime scene reconstructionist reassembled the physical evidence from the crime scene (the door, the door frame, and the damaged sheet rock where the bullet struck after exiting C.J.S.'s head) to discern the position of the rifle when appellant shot C.J.S. The evidence from the crime scene revealed that there was gunshot residue on the edge of the door and the door frame a few inches below the middle hinge. The evidence indicated that C.J.S. was standing behind the door in front of the wall—just behind the hinged gap between the door and the door fame—for her time out. Analyzing the physical evidence from the crime scene, the gunshot wound to C.J.S. (the entrance wound, exit wound, and trajectory of the bullet reflected in the autopsy report and photos), the expert reconstructed the shooting event using a child mannequin matching C.J.S.'s height. Based on the reconstruction, the reconstruction expert opined that, at the instant of discharge, the end of the muzzle of the AR-15 "had to be very, very

9

near, if not touching the opening of the door and the door frame" such that "the end of muzzle was literally in the door opening"—that is, in the gap between the door and the door frame. He further opined that, at the time of discharge, "the child would have been toward the door opening or could have been 2 inches back" but "within that narrow range."[1]

Appellant argues that the evidence failed to show that he was aware of but consciously disregarded an unjustifiable risk of death to his daughter. He maintains that the evidence of the "dry fire" at Brown moments before showed that he "falsely and tragically" believed "that there was no risk that the gun was loaded" and thus believed "there was no risk of its discharge as he 'cleared' the gun going back to his room." However, his contention is premised on his claim that the rifle discharged when he "cleared" it. While that was what he initially told the police, appellant contradicted himself when he later admitted in his written statement that he deliberately pulled the trigger—purportedly after he "cleared the gun" by pulling the charging handle back. In addition, regarding his argument that the evidence showed that he believed the gun was not loaded, we note that testimony and evidence at trial reflected that a loaded magazine was in the rifle. The issue that appellant disputed in his statement to police was whether a round was chambered. In his statement, appellant said that he pulled the charging handle back "half way" and "glanced in the chamber an[d] [he] didn't see anything" so he pulled the trigger. However, testimony at trial, from several law enforcement officers who were familiar with proper handling of an AR-15 with a loaded magazine

---

[1] The photographs of the reconstruction depict the child mannequin with its head such that the child is looking through the hinged gap of the doorway into the hallway. The reconstruction expert offered two possible head positions: one with her head touching the wall and the door, the other with her head touching the wall, the door frame, and the door. Either position has the child "peeking through" the gap between the door and door frame into the hallway.

inserted, reflected that pulling the charging handle back was to ensure a round was chambered before firing, not the way to check if the chamber was empty. In addition, further testimony, including testimony from Rhodes, indicated that to "clear" a weapon, you first remove the magazine.

Moreover, appellant's contentions on appeal assume that the jury accepted his version of the incident. However, appellant gave contradicting statements to police about the circumstances under which he killed C.J.S. The jury, as fact finder, was free to assess appellant's credibility (or lack thereof) and was free to consider the conflicts raised by his statements to police in connection with the other evidence at trial—including the evidence regarding placement of the rifle in close proximity to his daughter's face when he pulled the trigger—and resolve those conflicts against him. That is, the jury was free to reject appellant's self-serving statements indicating that he did not believe the rifle would fire a round when he pulled the trigger or that he was not aiming at or toward his daughter when he pulled the trigger. We also note that, in considering the issue of whether appellant was aware of but consciously disregarded the risk to his daughter, the jury was entitled to consider appellant's statements—and, indeed, all of the evidence at trial—in light of appellant's military training regarding firearms and his experience with them, which the jury could have reasonably inferred from the evidence of his service in the Army.

Appellant dismisses the reconstructionist's evidence concerning the rifle's position at the time of the shooting, contending that the jury rejected the evidence concerning the positioning of the rifle and the placement of its muzzle in close proximity to C.J.S. at the time of discharge because the jury did not find appellant guilty of capital murder (the intentional or knowing killing of C.J.S.). However, it is equally plausible that the jury believed the evidence regarding the position

11

of the weapon when appellant pulled the trigger and shot C.J.S. but thought that appellant aimed the weapon at C.J.S. and pulled the trigger without the intent or knowledge to cause her death. As appellant acknowledges, the evidence showed that mere moments before shooting his daughter, appellant "dry fired" the weapon at Brown as he pointed it directly at her head. The evidence also showed that C.J.S. was looking out of the gap between the door and door frame—that is, peeking through toward appellant and the rifle—when she was shot. The evidence of C.J.S.'s injuries further showed that appellant fired the weapon when it was in close proximity to—perhaps only inches away from—his daughter's face. The jury could have made the reasonable inference from the evidence, including the position of the rifle and its proximity to C.J.S., that appellant fired the weapon at his daughter without the intent to kill her but did so recklessly, perhaps to scare her as a "joke" just as he did with Brown. *See Evans v. State*, 202 S.W.3d 158,163 (Tex. Crim. App. 2006) ("Although the parties may disagree about the logical inferences that flow from undisputed facts, '[w]here there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous.'" (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985))).

Viewing the evidence in the light most favorable to the verdict, we conclude that from the cumulative evidence presented at trial and the reasonable inferences from it, the jury could have found that appellant, a former soldier in the Army, was aware of but consciously disregarded a substantial and unjustifiable risk that his daughter would die when he held his AR-15 rifle in close proximity to his daughter's face, manipulated the charging mechanism of the rifle, which had a loaded magazine inserted, by pulling the charging handle back "half way," and then pulled the trigger after merely "glancing" in the chamber to check for a round before firing. *See Williams*, 235 S.W.3d

12

at 752 ("Those who are subjectively aware of a significant danger to life and choose, without justification, to engage in actions (or in some cases inactions) that threaten to bring about that danger have made a calculated decision to gamble with other people's lives." (quoting James Gobert, *Searching for Coherence in the Law of Involuntary Manslaughter: The English Experience*, 6 Crim. L.F. 435, 454 (1995))). Thus, we conclude that a rational factfinder could have found beyond a reasonable doubt that appellant recklessly caused his daughter's death. Accordingly, we conclude that the evidence is sufficient to support appellant's conviction for manslaughter. We overrule appellant's sole point of error.

## CONCLUSION

Having concluded that the evidence is sufficient to support appellant's conviction for manslaughter, we affirm the trial court's judgment of conviction.

_____

Edward Smith, Justice

Before Justices Baker, Triana, and Smith

Affirmed

Filed: March 6, 2019

Do Not Publish

13